Westlaw.

Not Reported in A.2d                                                                                      Page 1
Not Reported in A.2d, 1987 WL 16508 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Anadarko Petroleum Corp. v. Panhandle Eastern
Corp.
Del.Ch., 1987.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
ANADARKO PETROLEUM CORPORATION a
Delaware corporation, and Pan Eastern Exploration
Company, a Delaware corporation, Plaintiffs,
v.
PANHANDLE EASTERN CORPORATION, a
Delaware corporation, Panhandle Eastern Pipe Line
Company, a Delaware corporation, Trunkline Gas
Company, a Delaware corporation, Anadarko
Production Company, a Delaware corporation, R. L.
O'shields, R. D. Hunsucker, and R. C. Dixon,
Defendants.
Submitted:  August 24, 1987.
Decided:  September 8, 1987.

William Prickett, Vernon R. Proctor, Wayne J. Carey
and Glenn D. Fugate, of Prickett, Jones, Elliott,
Kirstol & Schnee, Wilmington, and Dan A. Spencer,
of Anadarko Petroleum Corporation, of Counsel, for
plaintiffs.
Lawrence A. Hamermesh, Leone L. Ciporin, and
Vicki A. Hagel, of Morris, Nichols, Arsht & Tunnell,
Wilmington; David B. Tulchin, Hyman L. Schaffer,
Norman Feit, and Pressly M. Millen, of Sullivan &
Cromwell, New York, New York; and Frank
Douglass, Charles G. King, and J. D. Page, of Scott,
Douglass & Luton, Houston, Texas, for defendants.

MEMORANDUM OPINION
BERGER, Vice Chancellor.
*1 In its decision of July 7, 1987, this Court resolved
various pre-trial motions in this dispute between an
oil and gas production company and its former
parent, an interstate gas pipeline company. See
Anadarko Petroleum Corp. v. Panhandle Eastern
Corp., Del. Ch., Civil Action No. 8738, Berger, V. C.
(July 7, 1987).  This is a follow-up to that decision,
addressing the scope of certain previously ordered
arbitration and the sufficiency of plaintiffs' remaining
claims.    Plaintiffs  are  Anadarko  Petroleum
Corporation  and  its  wholly-owned  subsidiary
(collectively 'Anadarko').  Defendants are Panhandle
Eastern Corporation and three of its subsidiaries
(collectively 'Panhandle') and three former directors
of Anadarko who were also officers and directors of
Panhandle.

I.  Scope of Arbitration

By letter dated February 13, 1987 (the 'February
Demand') Panhandle sought arbitration of certain
issues raised in this litigation pursuant to the
arbitration clauses found in the September 30, 1986
Spin-off Agreement between the parties (the 'Spin-
off  Agreement')  and  pursuant  to  the  parties'
underlying gas purchase contracts.    Panhandle's
motion to compel arbitration was granted by Order
dated July 22, 1987.  However, Anadarko questioned
whether the issues identified in the February Demand
encompassed all of its claims in Counts III and V of
the Amended and Supplemented Complaint (the
'Complaint').    Anadarko also suggested that the
applicable arbitration clauses are not broad enough to
encompass such claims.  After consideration of the
briefs and arguments addressing these two points, I
conclude that the February Demand does seek
arbitration of all remaining claims in Counts III and
V of the Complaint and that those claims are within
the scope of the arbitration clauses in the Spin-off
Agreement and the gas purchase contracts.

The February Demand identifies as the 'Arbitration
Issues,'  the  following  'matters  in  controversy'
between the parties:
1.  Interpretation and Application of Article VI(9) of
certain gas purchase contracts between Trunkline and
Anadarko,  and  comparable  provisions  of  gas
purchase contracts between PEPL and PEEC; and
2.  Obligations, if any, of Trunkline to Anadarko and
of PEPL to PEEC in respect of allocating their
respective natural gas purchases among Anadarko
and  PEEC  and  other  producers,  both  within
individual blocks, leases and fields and throughout
their respective systems.

February Demand, p. 1.  In its brief, Anadarko did
not discuss the scope of the above-quoted language.
I take Anadarko's silence to be a concession that the
February Demand does seek arbitration with respect
to all claims raised in Counts III and V of the
Complaint.    Even if Anadarko has not conceded this
point,  a  review  of  the  Complaint  confirms
Panhandle's position.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 1987 WL 16508 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Count III alleges that, on October 6, 1986, the board of directors of Anadarko voted to rescind certain agreements entered into in connection with the spin-off of Anadarko from Panhandle (the 'Disputed Agreements'). Approximately one week later, Panhandle allegedly threatened to cease taking Anadarko's share of production from fifteen off-shore gas fields unless Anadarko withdrew its rescission of the Disputed Agreements. As a result of that threat, Anadarko agreed to accept a reduced price for its gas until the end of November, 1986. Anadarko alleges that, beginning in December, 1986, it refused to accept the reduced price for its gas. Thus, Anadarko was again faced with the threat of irreparable injury if Panhandle were to carry out its threat to shut in Anadarko's share of gas production. The remaining allegations in Count III set forth the reasons why Panhandle should be enjoined from breaching the terms of the parties' gas purchase contracts.

**\*2** In short, Count III seeks injunctive relief for a threatened breach of Panhandle's contractual obligation to purchase certain quantities of gas from Anadarko. This claim clearly involves the interpretation and application of Article VI(9), which is the provision in the gas purchase contracts that requires Panhandle to take quantities of gas necessary to protect Anadarko from inequitable drainage.

Count V alleges that, after December 1, 1986, Panhandle reduced its takes from Anadarko in violation of Article VI(9) of the gas purchase contracts. Anadarko alleges that, by reducing takes of gas, Panhandle is discriminating against Anadarko in favor of co-producers and competitors and that Anadarko is suffering irreparable harm as a result of this reduction in takes. The claims asserted in Count V fall within both quoted paragraphs of the February Demand. They involve the interpretation and application of Article VI(9) of the gas purchase contracts as well as Panhandle's obligations, if any, with respect to the allocation of gas purchases among various producers. Thus, I am satisfied that the February Demand adequately invokes arbitration as to all of the claims raised in Counts III and V of the Complaint.

Having determined the scope of Panhandle's demand for arbitration, the question becomes whether the demand exceeds the scope of the relevant arbitration clauses. The parties agree that almost all of the gas purchase contracts contain the following language:
If and whenever any controversy shall arise out of this contract or out of the refusal to perform the

whole or any part thereof . . . [the matters in controversy] shall be submitted for determination by a board of arbitrators . . ..

Article IX-A, East Cameron Block 359 Contract.

Anadarko argues that this clause should be construed narrowly to exclude arbitration of its claim of economic coercion. A narrow construction is warranted, according to Anadarko, because the arbitration clause uses the limiting language, 'arising out of' rather than the more encompassing phrase, 'arising out of and relating to.'This distinction was relied upon by one court in holding that a claim of fraudulent inducement was not arbitrable where the contract provided for arbitration of 'any dispute or difference . . . aris [ing] under . . .' the contract.In re Kinoshita & Co., 287 F.2d 951, 952 (2d Cir. 1961).

Anadarko's position is undermined by the fact that the Kinoshita decision has been all but overruled. In S. A. Minercao da Trindade-Samitri v. Utah International, Inc., 745 F.2d 190, 194 (2d Cir. 1984), the United States Court of Appeals for the Second Circuit determined that Kinoshita is inconsistent with federal policy favoring arbitration and should be limited to its precise facts. In Mineracao, the court ordered arbitration of a fraudulent inducement claim based upon a clause requiring arbitration of 'any question or dispute aris[ing] or occur[ing] under' the contract.See also Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840 (2d Cir. 1987) (rejecting the Kinoshita analysis); Mar-Len of Louisiana, Inc. v. Parsons-Gilbane, 773 F.2d 633 (5th Cir. 1985) (same).

**\*3** The other cases cited by Anadarko are distinguishable. In Mediterranean Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458 (9th Cir. 1983), several of plaintiff's claims were held to be beyond the scope of a clause providing for arbitration of 'any disputes arising hereunder . . ..' The Court there, relying on Kinoshita, construed the arbitration clause narrowly to preclude arbitration of a claim for inducing the breach of a separate contract, for quantum meruit and for conversion of certain documents. None of those claims, however, related to the interpretation or performance of the contract at issue. Here, by contrast, the economic coercion claim is directly related to Panhandle's performance of the contract. Anadarko alleges that Panhandle has wrongfully reduced its takes of gas in violation of the gas purchase contracts.See Complaint, ¶ ¶ 56, 59.

Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Union, 359 F.2d 598 (2d Cir. 1966) is also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 3
Not Reported in A.2d, 1987 WL 16508 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

inapposite. There, an employer brought a statutory damage action for injury sustained as a result of a union's allegedly unlawful secondary activities in connection with a labor dispute. The court held that the tort damage claim was not arbitrable under the terms of the parties' collective bargaining agreement because whether the union violated the collective bargaining agreement or not had no bearing on the validity of the statutory damage claim or on the determination of the issues presented by that claim. As noted above, Anadarko's tort claim is expressly predicated upon alleged violations of the gas purchase contracts. Finally, Armada Coal Export, Inc. v. Interbulk, Ltd., 726 F.2d 1566 (11th Cir. 1984) involved a clause providing for arbitration of disputes 'arising during the execution' of the contract.Id. at 1568. Tort claims of wrongful attachment and conversion were held non-arbitrable because there was an insufficient connection between the tort claims and the contract. Again, that is not the case here.

In Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 (1983), the Supreme Court, recognizing the federal policy favoring arbitration, stated that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . ..' Federal appellate courts have echoed this approach in strong terms.See Mar-Len of Louisiana, Inc. v. Parsons-Gilbane, 773 F.2d at 636 [heavy presumption that arbitration should not be denied, "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue."Citing Wick v. Atlantic Marine, Inc., 605 F.2d 166, 168 (5th Cir. 1979)]; S. A. Mineracao da Trindade-Samitri v. Utah International, Inc., 745 F.2d at 194 (arbitration clauses must be construed as broadly as possible). Consistent with this approach, I find that the claims raised in Counts III and V of the Complaint are within the scope of the arbitration clauses of the gas purchase contracts.* The parties agree that the arbitration clause under the Spin-off Agreement is broader than that contained in the gas purchase contracts. Accordingly, I conclude that the claims raised in Counts III and V of the Complaint are also arbitrable under the Spin-off Agreement.

II.  The Merits of the Remaining Substantive Claims

**\*4** Count IV of the Complaint seeks a declaratory judgment that the Disputed Agreements and others executed in connection with the spin-off are invalid because (1) they are grossly unfair to Anadarko; (2)

they are without consideration to Anadarko; and (3) they were forced upon Anadarko in breach of the individual defendants' fiduciary duties. The parties briefed the fiduciary duty element of Count IV in connection with Panhandle's motion to dismiss. However, they did not separately address the sufficiency of the allegations of gross unfairness or lack of consideration. Accordingly, the Court declined to reach those issues. Now that there has been additional briefing and argument, I am satisfied that Count IV fails to state a claim upon which relief may be granted.

Although Anadarko argues to the contrary, I find that its allegations of lack of consideration and gross unfairness are premised upon the theory that Panhandle owed fiduciary duties to Anadarko in connection with the spin-off. Having determined that this premise is incorrect, the remaining claims in Count IV are not viable. It is evident that Anadarko is relying upon fiduciary principles in support of its remaining claims because the authorities it relies upon are primarily fiduciary duty cases.See, e.g., Schnell v. Chris-Craft Industries, Inc., Del. Supr., 285 A.2d 437 (1971); Weinberger v. U.O.P., Inc., Del. Supr., 457 A.2d 701 (1983); Rabkin v. Philip A. Hunt Chemical Corp., Del. Supr., 498 A.2d 1099 (1985). Where, as here, a parent is dealing with its wholly-owned subsidiary, it has been held that there need be no consideration for a transfer of assets between the companies.United States v. American Telephone & Telegraph Co., 552 F. Supp. 131 (D.D.C. 1982).

Anadarko attempts to distinguish AT&T on the ground that AT&T involved a spin-off of assets with no future contractual relations between the parties whereas here, Panhandle forced Anadarko to enter into allegedly unfair long term agreements with Panhandle. However, Anadarko offers no authority for the proposition that, when the parties to a spin-off have continuing contractual relations, those contracts must be negotiated at arms length. This is not a case where an existing creditor of Anadarko is complaining that the spin-off impaired its rights.Cf. Guaranty Trust Co. of New York v. Grand Rapids G.H. & N. Ry. Co., 7 F. Supp. 511 (W.D. Mich. 1931), modified, United Light and Power Co. v. Grand Rapids Trust Co., 85 F.2d 331 (6th Cir. 1936) (recognizing that parent-subsidiary contracts are voidable on behalf of creditors where they divert subsidiary's assets without consideration). Thus, based upon AT&T, I conclude that Anadarko has no standing to complain about the alleged unfairness or lack of consideration of the Disputed Agreements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 4
Not Reported in A.2d, 1987 WL 16508 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Alternatively, Anadarko argues that Panhandle has violated the implied covenant of good faith and fair dealing imposed upon the parties to every contract. See Wilgus v. Salt Pond Investment Co., Del. Ch., 498 A.2d 151 (1985). However, the implied covenant of good faith and fair dealing does not deal with the formation of the contract, but with its performance. Restatement (Second) of Contracts, § 205, Comment c. (1981). Count IV of the Complaint does not raise any issue as to Panhandle's performance of the Disputed Agreements. Therefore, Anadarko's reliance upon this principle is misplaced.

**\*5** Based upon the foregoing, Panhandle's motion to dismiss or for summary judgment as to Count IV of the Complaint is granted.

IT IS SO ORDERED.

> FN* Anadarko suggests, in two sentences and without any authority, that the Complaint alleges claims of economic coercion, duress and tortious interference with contract against the individual defendants, who are not parties to the gas purchase contracts. I find nothing in the Complaint to support such claims and, for the reasons advanced by Panhandle in its brief, I find no merit to Anadarko's contention that these purported claims somehow defeat Panhandle's right to arbitration.

Del.Ch., 1987.
Anadarko Petroleum Corp. v. Panhandle Eastern Corp.
Not Reported in A.2d, 1987 WL 16508 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Goodwin Properties, LLC v. Acadia Group, Inc.
D.Me.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Maine.
GOODWIN PROPERTIES, LLC, et al., Plaintiffs
v.
ACADIA GROUP, INC., et al., Defendants
**No. 01-49-P-C.**

July 17, 2001.

Ralph A. Dyer, Esq., Portland, for Goodwin
Properties LLC, John M Goodwin, as Trustee of the
Goodwin Revocable Trust, Harold A Marden, Lois
Marden, individually and ex rel for Andrew M
Marden and ex rel for Sara L Marden, plaintiffs.
Michael A. Nelson, Jensen, Baird, Gardner & Henry,
Portland, Sean T. Carnathan, Esq., William H. Paine,
Esq., Jeffrey B. Rudman, Esq., Hale and Dorr,
Boston, MA, Deirdre M. Smith, Esq., Drummond,
Woodsum & Macmahon, Portland, for Acadia Group
Incorporated, Advest Inc, Billings & Co Inc, Emile L
Clavet, Kevin B Dean, defendants.

RECOMMENDED DECISION ON MOTIONS TO
DISMISS
COHEN, Magistrate J.
**\*1** The defendants, Acadia Group, Inc. ("Acadia"),
Advest, Inc. ("Advest"), Billings & Co., Inc.
("Billings"), Emile L. Clavet and Kevin B. Dean,
move to dismiss the complaint in this action arising
out of the sale of unregistered securities. There are
two motions, one brought by Advest and Billings and
the other by the remaining defendants. They raise
essentially the same issues. I recommend that both
motions be granted.

I. Applicable Legal Standard

The motions invoke Fed.R.Civ.P. 9(b) and
12(b)(6). "When evaluating a motion to dismiss under
Rule 12(b)(6), [the court] take[s] the well-pleaded
facts as they appear in the complaint, extending the
plaintiff every reasonable inference in [its]
favor." *Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d
184, 187 (1st Cir.1993). The defendant is entitled to
dismissal for failure to state a claim "only if it clearly
appears, according to the facts alleged, that the

plaintiff cannot recover on any viable
theory." *Correa-Martinez v. Arrillaga-Belendez,* 903
F.2d 49, 52 (1st Cir.1990); *see also Jackson v.Faber,*
834 F.Supp. 471, 473 (D.Me.1993). The parties
disagree on the question whether the claims raised in
the complaint are subject to the Private Securities
Litigation Reform Act of 1995 ("PSLRA"), Pub.L.
104-67, 109 Stat. 737.If the PSLRA applies,
additional pleading requirements must be met. These
requirements will be discussed in Section X of this
recommended decision.

Fed.R.Civ.P. 9(b) provides: "In all averments of
fraud or mistake, the circumstances constituting fraud
or mistake shall be stated with particularity. Malice,
intent, knowledge, and other condition of mind of a
person may be averred generally."A complaint
alleging fraud in connection with a transaction in
securities must "(1) specify the statements that the
plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements
were made, and (4) explain why the statements were
fraudulent." *Suna v. Bailey Corp.,* 107 F.3d 64, 68
(1st Cir.1997) (quoting *Shields v. Citytrust Bancorp.,*
*Inc.,* 25 F.3d 1124, 1127-28 (2d Cir.1994)). A
securities plaintiff "must allege specific facts that
make it reasonable to believe that defendant [s] knew
that a statement was materially false or
misleading." *Id.* (internal quotation marks omitted;
brackets in original). Statements made on information
and belief do not meet the particularity requirement
of Rule 9(b) unless the complaint also pleads facts on
which the belief is founded. *In re One Bancorp Sec.*
*Litig.,* 135 F.R.D. 9, 12-13 (D.Me.1991). Further
refinements of this standard by the First Circuit will
be discussed in Section X of this recommended
decision.

II. Factual Background

The complaint includes the following relevant factual
allegations. Plaintiff Goodwin Properties, LLC is a
New Hampshire limited liability company.
Complaint (Docket No. 1) ¶ 8. Plaintiff John
Goodwin is the trustee of the Goodwin Revocable
Trust, a Florida trust with an address in New
Hampshire.*Id.* ¶ 9. Plaintiffs Harold and Lois
Marden are residents of Maine. *Id.* ¶ ¶ 10-11.Lois
Marden asserts claims on her own behalf and on
behalf of her two minor children. *Id.* ¶ ¶ 12-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

13.Arcadia is a publicly held Colorado corporation with a principal place of business in Auburn, Maine. *Id.* ¶ 14.Advest is a Delaware corporation with a place of business in Lewiston, Maine.*Id.* ¶ 15.Billings is a Connecticut corporation with its principal place of business in Hartford, Connecticut. *Id.* ¶ 16.Emile L. Clavet is a resident of Auburn, Maine and chairman of the board of Acadia. *Id.* ¶ 17.Kevin B. Dean is a resident of Auburn, Maine and executive vice president and a director of Acadia. *Id.* ¶ 18.He served as treasurer of Acadia from approximately November 22, 1999 through March 9, 2000. *Id.*

**\*2** Prior to November 19, 1999 Acadia National Health Systems, Inc. ("ANHSI"), a publicly held corporation, provided business management services to physicians and hospitals. *Id.* ¶ 19.As of September 30, 1999 ANHSI had issued and outstanding 5,013,987 shares of common stock. *Id.* ¶ 20.Prior to November 19, 1999 ANHSI formed WorldLecture.com, Inc. for the purpose of acquiring MedLecture.com, Inc. by merger and also formed Acadia Merger Holding Company for the purpose of acquiring substantially all of the assets of ANHSI, subject to liabilities. *Id.* ¶ 21.On November 19, 1999 MedLecture.com, Inc., which sold continuing education services via the Internet, was merged into WorldLecture.com, Inc. and ANHSI issued 5,363,897 shares of its common stock in consideration for the purchase of the outstanding shares of MedLecture.com, Inc. *Id.* ¶¶ 22-23.At the same time, Acadia was created as a post-merger holding company with ANHSI as a subsidiary. *Id.* ¶ 24.

After November 19, 1999 Acadia described its mission as a venture capital incubator corporation providing management and financial services to entrepreneurs; it intended to acquire ownership positions in the entrepreneurial ventures in which it participated. *Id.* ¶ 26.On and after this date Clavet and Dean became the controlling persons of Acadia by reason of their aggregate ownership of 20.8% of its issued and outstanding voting stock, their respective positions as Acadia's chairman of the board and treasurer, and their actual direction of Acadia's day-to-day business affairs. *Id.* ¶ 30.Acadia had no prior history as a venture capital incubator corporation. *Id.* ¶ 31.

On or about April 30, 1999 ANHSI obtained loans from Citizens Bank of New Hampshire to finance the operation of its medical management services business. *Id.* ¶ 32.The bank provided a line of credit

up to $1,250,000 and a term loan of $250,000. *Id.* On September 30, 1999 ANHSI owed $1,043,154 on the line of credit and $243,006 on the term loan. *Id.* ¶ 33.On or about November 19, 1999 Acadia contacted the bank, which gave conditional consent to the reorganization and restructuring and waived default on the loan agreements. *Id.* ¶ 35.At that time, the bank informed Acadia that it would not continue the lending relationship beyond April 30, 2000. *Id.* ¶ 36.On December 30, 1999 the bank restructured the lending relationship to include Acadia and its subsidiaries as borrowers. *Id.* ¶ 37.

On or about November 22, 1999 the board of directors of Acadia voted to authorize the sale of not less than 1,052,632 and not more than 2,105,263 shares of its common stock at the price of $4.75 per share in a private offering as defined by section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77(2).*Id.* ¶ 39.The shares were not registered with the Securities and Exchange Commission or the Maine Securities Administrator. *Id.* ¶ 40.Acadia has at all relevant times claimed that the offering was exempt from the registration requirements of the Securities Act and the Revised Maine Securities Act and complied with Regulation D, 17 C.F.R. § § 230.501-230.505. *Id.* Acadia employed Advest to act as investment banker and place the shares with investors. *Id.* ¶ 41.Acadia also employed Billings, Advest's sister corporation, to participate in the solicitation of investors as a subcontractor to Advest. *Id.* ¶ 42.

**\*3** On or about February 8, 2000 Acadia published a confidential private offering memorandum ("CPOM") offering the shares for a total price of $10,000,000. *Id.* ¶ 43.Over a period of weeks prior to February 10, 2000 representatives of Advest solicited Goodwin to subscribe for shares to be offered by Acadia. *Id.* ¶ 45.On or about February 10, 2000 Goodwin received the CPOM and a supplementary form from Advest. *Id.* ¶ 46.On or about February 21, 2000 Goodwin executed and delivered to Advest a subscription agreement and related documents to purchase 63,000 shares of the Acadia common stock on behalf of Goodwin Properties, LLC. *Id.* ¶ 47.Also on that date, Goodwin executed and delivered to Advest a subscription agreement and related documents to purchase 10,000 shares of the stock on behalf of the John Goodwin Revocable Trust. *Id.* ¶ 48.In both cases, the entire subscription price was paid to First Union Trust as escrow agent to be held in escrow pending satisfaction of the conditions described in the escrow agreement attached as Exhibit A to the CPOM. *Id.* ¶¶ 47-48.After March 7, 2000 Goodwin received a first supplement to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 3
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

CPOM which included a copy of Acadia's quarterly report (Form 10QSB) for the period ended December 31, 1999. *Id.* ¶ 49.

Over a period of weeks prior to February 10, 2000 authorized representatives of Advest solicited Harold Marden to subscribe for the shares to be offered by Acadia. *Id.* ¶ 50.On or about February 10, 2000 Harold Marden received the CPOM and a supplementary form. *Id.* ¶ 51.On a date in February 2000 Harold and Lois Marden executed and delivered to Advest a subscription agreement to purchase 21,053 shares of the Acadia common stock and subscription agreements to purchase 2,105 shares of the Acadia common stock on behalf of each of their minor children. *Id.* ¶¶ 52-53.The entire subscription price for each purchase was paid to the escrow agent. *Id.* Harold Marden received a copy of the first supplement to the CPOM after March 7, 2000. *Id.* ¶ 54.

The subscription agreements were irrevocable and performance was subject only to the determination by Acadia that the terms of the offering had been met.*Id.* ¶ 57.

On or about March 17, 2000 Goodwin and Harold Marden both received a second supplement to the CPOM which included an amended current report (Form 8-K/A) presenting audited financial statements for MedLecture.com, Inc. for the nine month period ending September 30, 1999 and unaudited combined financial statements of MedLecture.com, Inc. and ANHSI for the twelve month period ending September 30, 1999. *Id.* ¶ 58.On or about April 21, 2000 Goodwin and Harold Marden each received a third supplement to the CPOM. *Id.* ¶ 60.

On January 18, 2000 Acadia borrowed $450,000 from Clavet and Dean and $50,000 from another director of Acadia, agreeing to repay the loans with proceeds from the offering. *Id.* ¶ 59.The loans were repaid with interest and fees from the proceeds of the offering on May 4, 2000. *Id.* On February 25, 2000 Acadia borrowed $200,000 from Clavet and Dean, and on March 17, 2000 another $50,000, all to be repaid from the proceeds of the offering. *Id.* These loans were converted into shares of Acadia's common stock on April 26, 2000, based on a payment obligation of $305,000 and a conversion price of $4.75 per share.*Id.*

**\*4** On April 26, 2000 Acadia deemed the conditions of the offering satisfied and accepted subscriptions from investors for 1,059,073 shares of its common stock and for total gross proceeds of $5,030,596.75 less related fees, expenses and commissions. *Id.* ¶ 61.The proceeds included $3,585,000 in investments and retirement of debt and other obligations in the amount of $1,450,000.*Id.* On April 30, 2000 Acadia's line of credit expired and Citizens Bank of New Hampshire demanded payment for all amounts due on the line of credit and the term loan. *Id.* ¶ 62.On or about June 1, 2000 the bank made a formal demand for payment and Acadia formally defaulted. *Id.* ¶ 63.On or about July 7, 2000 the bank began legal action for collection and attached certain assets of Acadia and its subsidiaries. *Id.*

The market value of Acadia's common stock began a steep decline on or about April 30, 2000. *Id.* ¶ 65.The shares purchased by the plaintiffs have been valueless since approximately July 7, 2000. *Id.* On or about September 28, 2000 the directors of Acadia voted to cease operations. *Id.* ¶ 64.

### III. Discussion

The complaint alleges violation of 15 U.S.C. § 77t(a), 15 U.S.C. § 77e(b)(2), 17 U.S.C. § 77l (2), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and 32 M.R.S.A. §§ 10201 and 10401, as well as common law counts of fraud, negligent misrepresentation and breach of contract. The defendants contend that the documents involved in the offering establish that it was a private offering exempt from the statutory requirements on which the plaintiffs rely, that the complaint fails to meet applicable pleading requirements and that the court should decline to exercise jurisdiction over the state-law claims, if those claims are not subject to dismissal themselves. Portions of the documents at issue have been attached to and included by reference in the complaint. Complaint ¶¶ 43, 46, 49, 55, 58, 60 & Exhs. A-F. The defendants have provided the remaining portions of those documents. "In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment."*Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996).

### A. The Claims Under 15 U.S.C. §§ 77e & 77l

Count I of the complaint alleges violation of 15 U.S.C. § 77e(a), also known as section 12(1) of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

Securities Act. Count III invokes 15 U.S.C. § 77e(b)(2). Count IV is based on 15 U.S.C. § 77*l* (a)(2), also known as section 12(2) of the Securities Act. The defendants' claim that the offering in which the plaintiffs participated was a private offering under the Securities Act, exempting it from the requirements of these statutes, applies equally to all three counts. 15 U.S.C. § 77d(2) ("The provisions of section 77e of this title shall not apply to ... transactions by an issuer not involving any public offering."). This statutory section is also known as section 4(2) of the Securities Act.

**\*5** The sections of the Securities Act on which the plaintiffs rely provide as follows:
Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly-
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).It shall be unlawful for any person, directly or indirectly-

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

15 U.S.C. § 77e(b)(2).Any person who-

(2) offers or sells a security ..., by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission, and who shall not sustain the burden of proof that he did not know, and in the

exercise of reasonable care could not have known, of such untruth or omission,
shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l* (a)(2). There is no dispute that the stock purchased by the plaintiffs was a security within the definition provided by the Securities Act. 15 U.S.C. § 77b(a)(1).

The regulations that implement 15 U.S.C. § 77d(2) are found at 17 C.F.R. § § 230.501-230.508, commonly referred to as Regulation D. The defendants contend that the offering to which the plaintiffs responded by making the purchases at issue fell within the requirements of those regulations and that this fact is apparent from the face of the complaint and the incorporated documents. Motion to Dismiss of Defendants Advest, Inc. and Billings & Co., Inc ., etc. ("Advest Motion") (Docket No. 5) at 8-14; Motion to Dismiss of Acadia Group, Inc., Emile L. Clavet and Kevin B. Dean, etc. ("Acadia Motion") (Docket No. 10) at 10.The plaintiffs respond that this question cannot be resolved in the context of a motion to dismiss, Plaintiffs' Objection to Motions to Dismiss by All Defendants, etc. ("Plaintiffs' Objection") (Docket No. 12) at 7,[FN1] and that two reasons why the offering did not meet the regulatory requirements are apparent on the face of the complaint, *id.* at 10.

> FN1. The plaintiffs contend that "[t]he Defendants do not come close to meeting their burden of proof."Plaintiffs' Objection at 7. This is not an accurate statement of the legal standard applicable to a motion to dismiss, which was set out in section I of this recommended decision.

**\*6** The plaintiffs' first argument is incorrect. In *Maldonado v. Dominguez,* 137 F.3d 1, 8 (1st Cir.1998), the First Circuit specifically found that the pleadings in that case established that the placement at issue was a private placement and affirmed the district court's grant of the defendants' motion to dismiss. In *Fisk v. SuperAnnuities, Inc.,* 927 F.Supp. 718 (S.D.N.Y.1996), the only case cited by the plaintiffs on this point that actually addresses Regulation D, the district court held that the private

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

placement documents would not be sufficient to support dismissal of the plaintiff's claim based on an allegation that the offering was not in fact a private one when there was evidence supporting the plaintiff's suggestion that the offering was not limited to the appropriate type of investors. *Id.* at 730-31. The plaintiffs' allegations in the complaint in this action concerning the facts that they believe take the offering at issue outside Regulation D are not sufficiently similar to those made in *Fisk,* and, in any event, even if this court were not constrained to follow First Circuit law, I find the language of the *Fisk* court to be unduly expansive on this point, particularly in the light of the pleading requirements imposed by the PSLRA, which will be discussed later in this recommended decision.

The plaintiffs offer two duly pleaded reasons why the offering at issue may not be considered private and accordingly exempt from the statutory or regulatory requirements that provide the basis for their claims in Counts I, III and IV at this stage of the proceedings: (i) they were not duly accredited investors as defined by 17 U.S.C. § 77b(a)(15) and the CPOM issued in connection with the subject offering and as required by 17 C.F.R. § 230.506; and (ii) the corporate reorganization that preceded the offering was "a scheme intended to evade the [corporate security] registration requirements," an apparent reference to Preliminary Note 6 to Regulation D.[FN2] Plaintiffs' Objection at 10; Complaint ¶¶ 68-71.

> FN2. The note provides:
> In view of the objectives of these rules and the policies underlying the Act, regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with these rules, is part of a plan or scheme to evade the registration provisions of the Act. In such cases, registration under the Act is required.
> Preliminary Note 6 to Regulation D-Rules Governing the Limited Offer and Sale of Securities Without Registration under the Securities Act of 1933, immediately preceding 17 C.F.R. § 230.501.

Section 506 of Regulation D provides an exemption from registration requirements for offers and sales of securities that satisfy all of the terms and conditions of sections 501 and 502, when there are no more or the issuer reasonably believes that there are no more than 35 purchasers of the offering and when each

person who is not an accredited investor has such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of the proposed investment, or the issuer reasonably believes that the purchaser comes within this description. The plaintiffs' argument is based solely on their contention that they are not accredited investors and did not have such knowledge and experience. Plaintiffs' Objection at 10-12. For the purposes of section 506, an "accredited investor" is defined as follows, in relevant part:

*Accredited investor. Accredited investor* shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

**\*7**  (3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching that same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii)....

17 C.F.R. § 230.501(a).

The plaintiffs make no attempt to show how or why the definition of "accredited investor" at 15 U.S.C. § 77b(a)(15), which is limited to the term's use "in this subchapter" of the statute, applies to the offering at issue, which was purportedly made under 15 U.S.C. § 77d(2), which does not use the term. In any event, the statutory definition specifically includes "any person who ... qualifies as an accredited investor under rules and regulations which the Commission shall prescribe," 15 U.S.C. § 77b(a)(15)(ii), and thus

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

includes the definition provided by 17 C.F.R. § 230.501(a) quoted above.

The defendants argue that the plaintiffs represented in writing at the time of the sale that they were accredited investors and may not now rely on the allegations in their complaint that they were not. Advest Motion at 8-10; Acadia Motion at 11. The plaintiffs respond that their allegations in paragraphs 71(a) and 72 of the complaint are sufficient to avoid dismissal and that the defendants' argument relies on the doctrine of equitable estoppel, which is not applicable under the circumstances. Plaintiffs' Objection at 10-12. Paragraph 71(a) of the complaint alleges that the plaintiffs were not accredited investors because "the issuer had no reason to believe that purchasers had such knowledge and experience in financial and business matters that they were capable of evaluating the merits and risks of the investment" and because the issuer "failed to provide the information required by 17 C.F.R. § 230.502(b)(2)." Complaint ¶ 71(a). Paragraph 72 merely recites that the plaintiffs were in fact unable to recognize "the nature of the issuer's business, the financial position of the issuer and the risks of loss of the investment" due to the alleged failure to provide required information or to sell registered securities. *Id.* ¶ 72.

First, the applicable regulatory definition of an "accredited investor" does not require that the issuer have reason to believe that the purchaser had certain knowledge and experience. Indeed, the formulation upon which the plaintiff relies applies only when the investor is *not* accredited. 17 C.F.R. § 230.506(b)(2)(ii). The plaintiffs themselves provided the defendants with reason to believe that they were accredited investors as defined by 17 C.F.R. § 230.501(a). Confidential Private Offering Memorandum (Exh. A to Advest's Motion) at 6 & Exh. A (Form of Escrow Agreement) at 1; Goodwin Properties L.L.C. Subscription Agreement (Exh. E to Advest's Motion) § § 4(c), 5.1 & Schedules A & B thereto; [Marden] Subscription Agreement (Exh. F to Advest's Motion) § § 4(c), 5.1 & Schedules A & B thereto. They cannot now disavow those representations in order to support their claims against the defendants. *Wright v. National Warranty Co., 953 F.2d 256, 260 (6th Cir.1992)* (summary judgment); *Noz v. Value Investing Partners, Inc., 1999 WL 387400 (S.D. N.Y. June 14, 1999)* at *1 (motion to dismiss).[FN3] The complaint and the documents from which the plaintiffs' claims arise establish that the offering at issue did not lose its "private" status under Regulation D due to the status

of the plaintiffs as other than accredited investors. Contrary to the plaintiffs' argument, this analysis of the relevant documents does not depend on or require application of the doctrine of equitable estoppel.

> FN3. The plaintiffs assert in conclusory fashion that "[n]one of these cases are relevant to the issue at hand," Plaintiffs' Objection at 11 & n.4, but provide no reasons why this asserted distinction exists. After a review of the cited opinions, no basis for such a distinction is apparent to me.

**\*8** Nor does the allegation that the defendants failed to comply with 17 C.F.R. § 230.502(b)(2) help the plaintiffs avoid dismissal. Contrary to the necessary implication of the allegation in paragraph 71(a) of the complaint, there is no requirement in Regulation D or the relevant statutes that an investor receive certain information from the issuer in order to be considered accredited. In fact, the regulation cited by the plaintiffs itself makes this clear: "If the issuer sells securities under ... § 203.506 to any purchaser *that is not an accredited investor,* the issuer shall furnish the information specified in paragraph (b)(2) of this section to such purchaser a reasonable time prior to sale."17 C.F.R. § 230.502(b)(1) (emphasis added). Since the plaintiffs may not disavow their representations to the defendants that they were in fact accredited investors, this section of Regulation D does not apply to them.

The plaintiffs' second pleaded reason why the offering at issue was not private and accordingly not exempt from the requirements on which their claims are based-that the reorganization of Acadia in late 1999 represented an attempt to evade the registration requirements that renders Regulation D unavailable for purposes of the 2000 offering-is based on 17 C.F.R. § 230.502(a), Plaintiffs' Objection at 12, which provides:
All sales that are part of the same Regulation D offering must meet all of the terms and conditions of Regulation D. Offers and sales that are made more than six months before the start of a Regulation D offering or are made more than six months after completion of a Regulation D offering will not be considered part of that Regulation D offering, so long as during those six month periods there are no offers or sales of securities by or for the issuer that are of the same or a similar class as those offered or sold under Regulation D, other than those offers or sales of securities under an employee benefit plan as defined in rule 405 under the Act (17 CFR 230.405).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

17 C.F.R. § 230.502(a). No employee benefit plan is involved in this case. The complaint alleges that the reorganization took effect on November 19, 1999 and that the CPOM was issued on February 8, 2000, Complaint ¶¶ 31, 43, fewer than six months later.

The Acadia defendants respond, in conclusory fashion and without citation to authority, that "in this case there was only one" private offering. Reply Memorandum in Support of the Motion to Dismiss of Acadia Group, Inc., Emile L. Clavet and Kevin B. Dean ("Acadia Reply") (Docket No. 13) at 5. That is not the issue with respect to the plaintiffs' claim based on 17 C.F.R. § 230.502(a). The issue is whether the transfer of shares alleged in the complaint to have taken place during the reorganization must be integrated with the private offering at issue and, if so, whether the result of that integration is that exemption from registration pursuant to Regulation D was unavailable for the offering at issue. The complaint alleges that ANHSI issued shares of its common stock on November 19, 1996 in consideration for acquisition of the outstanding shares of MedLecture.com, Inc. Complaint ¶ 22. Such a transfer comes within the definition of sale applicable to section 230.502(a) of the regulations. 15 U.S.C. § 77b(a)(3); *see, e.g., Rathrone v. Rathrone, 683 F.2d 914, 918 (5th Cir.1982)* (stock-for-assets trade between independent corporations constitutes sale of securities for purposes of section 10(b) of Securities Act). Indeed, the SEC has promulgated regulations applicable to such transactions. 17 C.F.R. §§ 229.1000-229.1006. *See SEC v. Cavanagh, 1 F.Supp.2d 337, 363-367 (S.D.N.Y.1998)* (finding that unregistered sale of stock and earlier merger effectuated by issuance of stock should be considered integrated, making claimed exemption under 15 U.S.C. § 77d(1) unavailable).

**\*9** Accompanying section 230.502(a) of the regulations is a list of factors to be applied in determining whether two transactions should be considered integrated:
The following factors should be considered in determining whether offers and sales should be integrated for purposes of the exemptions under Regulation D:
(a) Whether the sales are part of a single plan of financing;
(b) Whether the sales involve issuance of the same class of securities;
(c) Whether the sales have been made at or about the same time;

(d) Whether the same type of consideration is being received; and
(e) Whether the sales are made for the same general purpose.

17 C.F.R. § 230.502(a) Note. The complaint alleges that stock of ANHSI was the consideration for the acquisition of MedLecture.com, Inc., Complaint ¶ 22, and that the issued stock of Acadia Group, Inc., "the post-merger holding company" of which ANHSI became a subsidiary, provides the basis for the claims in this action, *id.* ¶¶ 24, 39.Assuming *arguendo* that the two types of stock could be "the same class of securities," as required by the second factor, the complaint can be read to allege the first, second and fifth factors as well.*Id.* ¶¶ 22, 39, 69.However, the complaint cannot be read to allege that the same type of consideration was received for the two types of stock, the fourth factor of the regulatory test. The complaint can only be read to allege that stock and assets of MedLecture.com, Inc. were received as consideration for the first sale and cash and loan forgiveness was received for the second sale. Because the complaint fails to allege this element of the test for integration under 17 C.F.R. § 230.520(a), the plaintiffs cannot rely on this section of the regulations to support their allegation that the February 8, 2000 offering was not exempt from registration under Regulation D. *See generally Johnston v. Bumba, 764 F.Supp. 1263, 1272 (N.D.Ill.1991)* (requiring proof of all five factors).

The plaintiffs identify no other basis for their allegation that the transaction at issue was intended to evade registration requirements. Plaintiffs' Objection at 12-14. Accordingly, the defendants are entitled to dismissal of Count I of the complaint.

Count III of the complaint alleges failure to provide a prospectus in connection with the February 8, 2000 offering as allegedly required by 15 U.S.C. § 77e(b)(2). Complaint ¶¶ 79-82. However, the exemption provided by 15 U.S.C. § 77d(2) applies to all requirements of 15 U.S.C. § 77e. Accordingly, because the complaint fails to show on its face and in the incorporated documents that the offering at issue was anything other than a private offering exempt under section 77d(2), the defendants are entitled to dismissal of Count III.

Count IV of the complaint alleges fraud in the sale of the subject securities under 17 U.S.C. § 77*l* (2), commonly referred to as section 12(2) of the Securities Act. Complaint ¶¶ 84-87. The defendants contend that section 12(2) only applies to initial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public offerings, citing *Gustafson v. Allyod Co.,* 513
U.S. 561, 577, 584 (1995), and *Maldonado,* 137 F.3d
at 8-9. The plaintiffs respond that they have alleged
that the offering at issue was in fact public, not
private, and that such an allegation is sufficient.
Plaintiffs' Objection at 17-18. They also argue that
*Maldonado* does not apply to the case at hand and
that this court has used "[t]he *Maldonado* principle"
as "the basis for a more explicit ruling" in *Giarraputo
v. Unumprovident Corp.,* 2000 WL 1701294 (D.Me.
Nov. 8, 2000), and *Andrews v. Emerald Green
Pension Fund,* 2000 WL 1473376 (D.Me. Sept. 27,
2000). Plaintiffs' Objection at 18.

**\*10** In *Gustafson,* the Supreme Court held that
liability under section 12 of the Securities Act "is
imposed only as to a document soliciting the
public,"513 U.S. at 581, 584. The First Circuit in
*Maldonado* stated that a claim under section 12(2)
may be dismissed if the pleadings establish that the
stock at issue was placed privately. 137 F.3d at 8. *See
also Vannest v. Sage, Rutty & Co.,* 960 F.Supp. 651,
655 (W.D.N.Y.1997). That is the case here, as
discussed above, and the defendants are accordingly
entitled to dismissal of Count IV.[FN4]

> [FN4.] Paragraph 28 of this court's opinion in
> *Andrews,* the only specific citation included
> in the plaintiffs' reference to it, Plaintiffs'
> Objection at 18, has no bearing on the issue
> of the availability of section 12(2) relief. To
> the extent that the plaintiffs' reference to
> *Giarraputo,* unaccompanied as it is by a
> specific citation to any page in that 21-page
> recommended decision, can be construed to
> suggest that some support for the plaintiffs'
> argument may be found therein, I have been
> unable to locate anything in that
> recommended decision at all inconsistent
> with my recommend conclusion on this
> issue.

**B. The Claims Under 15 U.S.C. § 78j(b) and 17
C.F.R. § 240.10b-5**

In Count V, the complaint alleges that the defendants
violated 15 U.S.C. § 78j(b), commonly referred to as
section 10b of the Securities Exchange Act, and 17
C.F.R. § 240.10b-5, commonly referred to as Rule
10b-5. Complaint ¶¶ 89-97. In order to state a claim
under section 10b and Rule 10b-5, the plaintiffs must
show that (i) the defendants made a misrepresentation
or omission of material fact, (ii) with scienter, (iii)
upon which the plaintiffs relied, and (iv) that caused

damage to the plaintiffs. *Shaw,* 82 F.3d at 1217. The
defendants argue that the complaint should be
dismissed because it fails to meet the pleading
requirements of the PSLRA and Fed.R.Civ.P. 9(b)
and because it fails adequately to plead scienter and
loss causation. Advest Motion at 17-26; Acadia
Motion at 13-22.

The plaintiffs begin their opposition to this section of
the defendants' motions to dismiss by asserting that
the PSLRA does not apply to their complaint because
they have not brought a class action. Plaintiffs'
Objection at 19. However, the PSLRA by its terms
applies to actions other than class actions.[FN5]

> [FN5.] This fact makes it unnecessary to
> consider the plaintiffs' curious statement that
> "Plaintiff [sic] believes the ... standards
> [applied by the First Circuit to all actions
> claiming securities fraud before the
> enactment of the PSLRA] are excessive in
> the context of this case."Plaintiffs' Objection
> at 19.

In *any private action* arising under this chapter in
which the plaintiff alleges that the defendant-
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order
to make the statements made, in light of the
circumstances in which they were made, not
misleading;
the complaint shall specify each statement alleged to
have been misleading, the reason or reasons why the
statement is misleading, and, if an allegation
regarding the statement or omission is made on
information and belief, the complaint shall state with
particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (emphasis added). These
pleading requirements apply to this case.

The requirements of the PSLRA for pleading scienter
immediately follow the language quoted above.
In any private action arising under this chapter in
which the plaintiff may recover money damages only
on proof that the defendant acted with a particular
state of mind, the complaint shall, with respect to
each act or omission alleged to violate this chapter,
state with particularity facts giving rise to a strong
inference that the defendant acted with the required
state of mind.

15 U.S.C. § 78u-4(b)(2). The required state of mind
depends on the type of statement allegedly made. If

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

the allegedly false or misleading statement is forward-looking, a plaintiff must be able to prove that the defendant had actual knowledge that the statement was false or misleading when made. 15 U.S.C. § 78u-5(c)(1)(B). A forward-looking statement is defined as **\*11** (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial terms;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC];

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the [SEC].

15 U.S.C. § 78u-5(i)(1). If a statement is not forward-looking, the courts whose decisions are reported differ as to pleading requirements. Some require the plaintiff to plead facts giving rise to a strong inference of recklessness, either by demonstrating that the defendant had the motive and opportunity to commit fraud or by alleging specific facts constituting circumstantial evidence of conscious behavior or recklessness. *E.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994).* Other courts have rejected the "motive and opportunity" alternative, holding that the PSLRA has eliminated it in favor of the more stringent alternative pleading requirement. *E.g., In re Silicon Graphics, Inc. Sec. Litig., 970 F.Supp. 746, 756-57 (N.D.Cal.1997); In re Baesa Sec. Litig., 969 F.Supp. 238, 242 (S.D.N.Y.1997).* In any event, the First Circuit has specifically declined to review or adopt the "motive and opportunity" test set out by the Second Circuit in *Shields. Maldonado,* 137 F.3d at 10 n.6 (First Circuit will use its own previously-developed framework for analyzing sufficiency of pleadings in securities cases).

The primary element of a claim under section 10(b) and the accompanying Rule 10b-5 is a showing that the defendant made materially misleading statements or omissions. *Basic Inc. v. Levinson,* 485 U.S. 224, 230-31 (1988). A false statement or omission is considered material if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the decision to invest. *Id.* at 231."Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Id.* at 239 n.17. Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).

When the allegations in a complaint are based on information and belief, the First Circuit requires that both "the source of the information and the reasons for the belief" be laid out in the complaint. *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991). Not only must the time, place and content of the alleged misrepresentation be alleged, but the complaint must also contain

**\*12** factual allegations that would support a reasonable inference that adverse circumstances existed at the time (the statement or representation was made), and were known and deliberately or recklessly disregarded by defendants.

*Id.* While *Romani* predates the enactment of the PSLRA, the language of that statute is not inconsistent with *Romani's* requirement that the complaint set forth both the source of the information and the reasons for the belief. The intent of the PSLRA was to make the pleading requirements for private actions alleging securities violations more stringent than those imposed by *Fed.R.Civ.P. 9(b).Powers v. Eichen,* 977 F.Supp. 1031, 1038 (S.D.Cal.1997).

Rule 9(b) provides as follows:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The parties agree that the allegations at issue with respect to Count V are set forth in paragraph 86 of the complaint. Advest Motion at 19-20; Acadia Motion at 14-21; Plaintiffs' Objection at 20.

*1. Defendants Advest and Billings.*Advest and Billings begin with the argument that the complaint fails to allege that Advest and Billings themselves made any of the misrepresentations at issue and that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 10
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

the plaintiffs may not maintain a section 10(b) claim against them merely because they are alleged to have assisted the other defendants in doing so. Advest Motion at 18. The plaintiffs do not respond to this argument. Paragraph 86 of the complaint alleges that all defendants made specified and untrue statements, which appeared in the CPOM or Acadia's Form 10KSB for the period ending September 30, 1999, and that all defendants failed to make certain necessary disclosures. Complaint ¶ 86. There is nothing in the cited Form 10KSB that so much as suggests that Advest and Billings were in any way involved in the preparation or filing of that document, nor does the complaint make any such allegation. Accordingly, Advest and Billings are entitled to dismissal of any claims raised against them in Count V based on subsections (f), (g), and (i) of paragraph 86 of the complaint.

In _Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,_ 511 U.S. 164 (1994), the Supreme Court held that section 10(b) does not create liability for those who are alleged to have given aid to a person who commits a manipulative or deceptive act, but only for those who themselves engage in activity prohibited by that section, _id._ at 176-77. However, contrary to the assertions in Advest's motion, the remaining subsections of paragraph 86 of the complaint do not allege that Advest and Billings merely aided the other defendants in the specified violations of section 10(b). Those subsections allege that all of the defendants engaged directly in the violations and, in one instance, Complaint ¶ 86(a), mention Advest and Billings specifically. It is impossible to determine from the CPOM itself that the assertions made therein and alleged in the complaint to be misleading are made only by defendants other than Advest or Billings.

**\*13** Ordinarily, the plaintiffs' failure to respond to the argument of Advest and Billings on this point would be deemed a waiver of any objection, Local Rule 7(b), and the court could grant the motion even if erroneously based. _See, e.g., Trask v. General Signal Corp_., 1999 WL 1995204 (D.Me. Aug. 13, 1999), at * 3 (Rec. Dec. affirmed Sept. 15, 1999). In this case, I choose to rest my conclusion that Advest and Billings are entitled to dismissal of Count V to the extent that it is based on allegations other than those included in paragraph 86(f), (g) and (i) of the complaint on their alternative arguments, to which the plaintiffs did respond, which are discussed below.

_2. Information and belief._The defendants point out that all of the allegations in paragraph 86 are made on information and belief, Complaint at 22, and contend that the complaint fails to plead facts that satisfy the _Romani_ or PSLRA standards for such claims. Acadia Motion at 14; Advest Motion at 19-20. The plaintiffs do not respond specifically to this argument, perhaps because they contend-erroneously-that the PSLRA pleading standards do not apply to them and the pre-PSLRA pleading standards set forth by the First Circuit in _Romani_ and other similar cases "are excessive" and should not apply to them, for reasons that they fail to elucidate. In any event, the plaintiffs do address each subsection of paragraph 86 individually in a manner that could be taken to demonstrate a response to this argument, Plaintiffs' Objection at 20-24, so I will address each subsection separately in this regard.

Paragraph 86(a) alleges that Advest and Acadia at page 3 of the CPOM "stated the standards required for qualification of investors to subscribe for the purchase of Acadia's common stock in the Offering which could be amended only to comply with state or local law," a somewhat opaque summary of an extensive discussion of investor suitability found on page 3 of the CPOM. The paragraph further alleges that "such representation was untrue at and after the time made" and that "neither Acadia, Billings nor the individual Defendants had any intention to abide by such investor standards."While it is not apparent to me how Billings and the individual defendants can be liable for statements alleged in the same paragraph to have been made only by Acadia and Advest, that problem is not addressed by the parties. In response to the defendants' contention that this subparagraph neither states with particularity all facts upon which the plaintiffs' belief is formed, 15 U.S.C. § 78u-4(b)(1), nor lays out the source of the information and the reasons for that belief, _Romani_, 929 F.2d at 878, the plaintiffs cite paragraphs 3-6, 36, 59, 61, 62 and 71 of the complaint and argue that "[t]he circumstances strongly infer [sic] that the Defendants were ready to accept any living person with loose change in his pocket" and that it is the defendants' burden to prove that they consistently applied the accreditation standards set forth in the CPOM. Plaintiffs' Objection at 20. The latter argument is premature; the defendants will have no burden of proof if the allegations in the complaint are inadequate under the PSLRA and First Circuit precedent. With respect to the first argument, the cited paragraphs of the complaint do not provide the information required by the PSLRA or _Romani_.Accordingly, the defendants are entitled to dismissal of Count V insofar as it is based on paragraph 86(a) of the complaint.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*14** Paragraph 86(b) alleges that all of the defendants made the representation on page 6 of the CPOM "that money received from the Plaintiffs and other Subscribers to the Offering would be released from escrow and paid to Acadia only if 'capital in the amount of at least $4,550,000 million [FN6] [sic] is immediately available to the [Acadia] from this Offering,' ' that this representation was untrue when made, and that Acadia's statement of cash flow for the period ended June 30, 2000 subsequently showed that only $3,284,971 in capital was actually made available to Acadia from the offering. In response the plaintiffs cite paragraphs 3-6, 59, 61, 62, and 86(c) of the complaint and the asserted fact that the offering was closed four days before Acadia's loan commitment expired and argue that "[t]he strong inference is that Acadia/Advest would close with whatever proceeds could be generated in order to keep the business afloat." Plaintiffs' Objection at 21. None of the cited paragraphs of the complaint makes the necessary showing of the source of the alleged information.[FN7]The defendants are entitled to dismissal of Count V to the extent that it is based on paragraph 86(b).

> **FN6.** The word "million" does not appear in the original. CPOM at 6.

> **FN7.** In addition, as the Advest defendants point out, the word "capital" in the CPOM need not be defined solely as "cash," a necessary predicate of the plaintiffs' argument. Advest Motion at 20 n. 17. By the terms of the complaint, the offering generated total gross proceeds of $5,030,596.75, of which $1,450,000 represented retirement of debt and other obligations. Complaint ¶ ¶ 59, 61.

Paragraph 86(c) alleges that all of the defendants stated on page 12 of the CPOM that the net proceeds of the offering would be used "to further capitalize [Acadia's] two subsidiaries, ... to repay certain indebtedness and accrued interest on lines of credit, and ... to meet operating expenses of Acadia," and that this representation was untrue when made because "all or a substantial amount of the Offering proceeds were used to repay debts ... which were not lines of credit, to pay delinquent accounts payable to vendors, and to cure payment defaults in loans made to Acadia by Citizens."The defendants refer to the statement in the CPOM that reads "Management will have broad discretion in how to use the net proceeds

of this Offering," Advest Motion at 20, but it is not necessary to consider this statement.[FN8]Paragraph 86(c) alleges nothing to support its assertion that the quoted statement from page 12 of the CPOM was untrue. Use of the proceeds of the offering to repay debts other than lines of credit, to pay accounts payable and to cure payment defaults on loans is not inconsistent with the statement that the proceeds would be used to repay "certain indebtedness" and "to meet operating expenses." Contrary to what appears to be the underlying premise of the plaintiffs' argument with respect to this subparagraph, Plaintiffs' Objection at 21, the quoted language from page 12 of the CPOM did not require Acadia to use the proceeds of the offering for all of the listed purposes.[FN9]The defendants are entitled to dismissal of Count V to the extent that it is based on the allegations in paragraph 86(c).

> **FN8.** If I were to reach this argument, I find persuasive the reasoning of Judge Martin in *Halperin v. eBanker USA. COM, Inc., 2001 WL 274120 (S.D.N.Y. March 19, 2001),* at \*3 (statement that "amounts actually expended for each use are at the discretion of the Board of Directors and may vary significantly depending upon a number of factors" barred section 10b claim that representation that proceeds from sale of stock would be used for working capital when part of proceeds was actually used for allegedly speculative investment).

> **FN9.** The plaintiffs' assertion that "[t]he Defendants do not contest the truthfulness of the allegations," Plaintiffs' Objection at 21, displays a fundamental misunderstanding of the issue before the court at this time. The question is not whether the allegations in the complaint are truthful but rather whether those allegations, which are made on information and belief, are supported with sufficiently particular allegations concerning the source of the information and the reasons for the plaintiffs' belief that the allegations are truthful.

Paragraph 86(d) alleges that the following statement on page 12 of the CPOM was untrue when made by all of the defendants: "The Company believes that its existing sources of cash, together with the net proceeds from this Offering (assuming all Shares are subscribed for), will be sufficient to meet the Company's cash needs for its current business

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
(Cite as: Not Reported in F.Supp.2d)

through the second quarter of 2001."It alleges that this statement is untrue because Acadia was unable to pay its bills as they came due "at and after February 8, 2000," when the offering was issued, and because "[t]he entire Offering proceeds were committed or consumed upon availability from escrow on or about May 4, 2000."Complaint ¶ 86(d); Plaintiffs' Objection at 22-23. Neither of these facts makes the quoted statement untrue. The complaint alleges that not all of the shares in the offering were sold, Complaint ¶ 61, and neither the fact that Acadia was unable to make current payments on its bills at the time of the offering nor the fact that the funds actually received from the offering were exhausted before the second quarter of 2001 makes the quoted statement untrue. The plaintiffs contend that other paragraphs of the complaint support their allegation that this statement was untrue, specifically paragraphs 3-6, 34-39, 59, 61-62 and 86(e)-(m). Plaintiffs' Objection at 22. The cited paragraphs other than sections of paragraph 86 do not provide the support for this allegation that is required by the PSLRA and the First Circuit. While some of the allegations in later subsections of paragraph 86 might appear to provide some of the necessary support, the nature of the statement at issue is one of belief and it is forward-looking. 15 U.S.C. § 78u-5(i)(1). Accordingly, the complaint must offer allegations that demonstrate that the defendants had actual knowledge that the statement was false when made.[FN10]15 U.S.C. § 78u-5(c)(1)(B). For the reasons discussed below in my analysis of the remaining subsections of paragraph 86 of the complaint, the complaint fails to meet this standard. Accordingly, the defendants are entitled to dismissal of Count V insofar as it is based on the allegations in paragraph 86(d).

FN10. The complaint does not allege that the statement at issue was misleading when made, an alternate ground for liability under 15 U.S .C. § 78u-5(c)(1)(B).

*15 Paragraph 86(e) alleges that the following representation at page 21 of the CPOM was made by all defendants and was untrue when made: "The Company believes that its existing sources of cash, together with the net proceeds from this Offering (assuming the maximum Shares are subscribed for), will be sufficient to meet the Company's cash needs for its current business."The plaintiffs describe this allegation as "a corollary to the misrepresentation described in ¶ 86(d)." Plaintiffs' Objection at 23. However, this subparagraph provides much more

detail in support of its allegations than does paragraph 86(d). The problem is that the only sources cited in support of these factual allegations are Acadia's Form 10QSB for the period ended June 30, 2000, and the opinion of Acadia's auditors "[a]t June 30, 2000," that "Acadia's ability to continue as a going concern was doubtful."Neither document is provided by the plaintiffs. The auditors' opinion, reached and expressed after the statement at issue was made and after the offering had been closed without selling the maximum number of shares, cannot make the statement untrue nor demonstrate that the defendants knew it to be untrue when made. The Form 10QSB could only have been completed after the fact as well and cannot serve to prove actual knowledge on the part of any of the defendants that the forward-looking statement at issue was false when made on February 8, 2000. *See generally Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 367 (1st Cir.1994) ( "[P]laintiffs in a securities action have not alleged actionable fraud if their claim rests on the assumption that the defendants must have known of the severity of their problems earlier because conditions became so bad later on."). Accordingly, the defendants are entitled to dismissal of Count V insofar as it relies on paragraph 86(e).

Paragraph 86(f) alleges that the representation made at pages 16-17 of the Form 10KSB for the year ended September 30, 1999, which is Appendix Document 1 attached to the CPOM, to the effect that the accounts receivable balance of ANHSI was $1,052,415 and its net worth was $461,568 was untrue because the accounts receivable balance was overstated by approximately $490,000; ANHSI was insolvent as of September 30, 1999 because its liabilities exceeded its assets; and Acadia was insolvent as of November 19, 1999 for the same reason. The only support offered for these assertions by the plaintiffs is an "extensive financial analysis of Acadia made by its bank on June 23, 2000," Plaintiff's Objection at 23, which is not cited in the complaint. The plaintiffs seek leave to amend the complaint to incorporate this document, *id.,* but such an amendment would be futile. The document, a copy of which is attached to the plaintiffs' objection although the plaintiffs do not cite to any specific section or statement within the document, does not appear to include evidence that could reasonably give rise to an inference that any of the defendants knew as of February 8, 2000 that the amount of accounts receivable and net worth of ANHSI stated in the Form 10KSB, which includes an independent auditors' report supporting the financial statements at issue, Acadia Group Inc. Filing Type: 10KSB (Period End: Sep 30, 1999), attached to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 13
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

COPM, at 15-28, were false. The defendants are entitled to dismissal of Count V to the extent that it is based on paragraph 86(f).

**\*16** Paragraph 86(g) and the remaining subsections of that paragraph allege omissions rather than false or misleading statements. As noted previously, an omission is not actionable absent a duty to disclose. The Advest defendants point out correctly that the complaint fails to allege that the defendants had a duty to disclose the omissions alleged in subsections (g) through (m) of paragraph 86. Advest Motion at 23. The plaintiffs respond that "there was a duty to disclose these material omissions."Plaintiffs' Objection at 24. To the extent that the general rules applicable to motions to dismiss continue to apply in the context of a securities action, the plaintiffs are entitled to a reasonable inference to be drawn from the well-pleaded allegations in these subsections that such a duty existed. That inference alone will not save the remaining claims in paragraph 86, however.

In paragraph 86(g) the plaintiffs allege both that a statement at pages 23-24 of the same Form 10KSB concerning an outstanding note payable to Citizens Bank was untrue at the time it was made and that the bank's alleged November 19, 1999 demand for payment of the note in full by April 30, 2000 should have been disclosed. The only fact offered in paragraph 86(g) in support of the allegation that the statement was untrue is an assertion that the Form 10KSB said that the note was payable in monthly installments through June 4, 2000 but that the bank had made the alleged demand in November 1999 that it be paid in full by April 30, 2000, some 34 days earlier. However, the paragraph of the complaint alleging that the bank did in fact inform "Acadia senior management" on or about November 19, 1999 "and in subsequent conversations" that it would not continue its lending relationship with Acadia beyond April 30, 2000, Complaint ¶ 36, fails to state the source of this information, as required by *Romani.*Accordingly, the complaint does not support the allegation that the statement at issue was untrue when made. With respect to the claim that the defendants had a duty to disclose the alleged decision by the bank, something more than a conclusory statement that such a duty existed is required. A duty to disclose "may arise if, *inter alia,* a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information."*Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996). Of course, "a corporation does not commit securities fraud merely by failing to disclose all nonpublic

material information in its possession."*Id.* Here, while the alleged fact that the outstanding principal amount of $243,006 was payable on April 30, 2000 may have made the representation that the note was payable on June 4, 2000 inaccurate or incomplete, the plaintiffs have made no attempt to show that this information would be material. Under the circumstances, including the financial statements supplied with the CPOM showing accounts receivable in an amount that exceeded the value of the loan by a factor of five and the fact that the offering sought to raise between $5,000,00 and $10,000,000, I can only conclude that the failure to mention that the loan was payable in full five weeks earlier did not alter the total mix of facts available to an investor nor was there a substantial likelihood that a reasonable shareholder would consider it important, *Basic,* 485 U.S. at 231, thereby rendering the alleged omission immaterial and not actionable. The defendants are entitled to dismissal of Count V to the extent that it is based on paragraph 86(g).

**\*17** In paragraph 86(h) the complaint alleges that the CPOM and its attachments omit the material fact that the Citizens loan was in default "at and after February 8, 2000," the date of the offering. The complaint fails to provide the source of this information and this paragraph fails for that reason alone. In addition, paragraph 86(h) does not provide sufficient information to allow the reader to draw the inference that this information was material. The defendants are entitled to dismissal of Count V to the extent that it is based on paragraph 86(h).

Paragraph 86(i) alleges that footnote 6 on pages 23-24 of the September 30, 1999 Form 10KSB failed to disclose the allegedly material facts discussed in connection with subsections (g) and (h) above and the allegedly material fact that the Citizens loan "was in default of borrowing limitations insofar as the line had been overdrawn."Paragraph 86(i) fails to meet the PSLRA and First Circuit pleading requirements for the reasons stated in connection with paragraph 86(g) and (h) above. The allegation of the existence of a default fails for the same reasons.

Paragraph 86(j) alleges that the CPOM and unidentified "related documents" omit the material fact that "at and after February 8, 2000, Acadia and/or Acadia National Health Systems, Inc., were in default of lease obligations for non payment of rent in a material amount ... and demand had been made by the lessor for payment."In the absence of any allegation of the "material amount" at issue and any identification of the lease obligations, this

Not Reported in F.Supp.2d                                                                                                    Page 14
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

subparagraph fails to meet the particularity requirements of the PSLRA. In addition, the complaint fails to identify which representations in which documents made by which defendants were rendered false, inaccurate, incomplete or misleading by the omission of this information.

Paragraph 86(k) alleges that the defendants failed to disclose in the CPOM or any of its attachments or supplements that Acadia "had undertaken a capital investment and business development effort commencing on or about November 16, 1999, that consumed capital beyond the resources of Acadia and increased operating expenses by approximately 267%."The plaintiffs do not identify any reference in the complaint to the source of this information or the basis for their belief that this statement is accurate, and this allegation is accordingly insufficient. The paragraph also alleges that the defendants "failed to disclose in the CPOM and other solicitation documents the material fact that sales for the three month period ending March 30, 2000 had dropped by approximately 50% from the corresponding period in the previous year."The CPOM was issued on February 8, 2000 and therefore could not have included this information. In addition, as noted above, there is no duty to disclose events occurring in the quarter during which the subject statements are issued. It is true that the court in *In re Quintel Entertainment Inc. Sec. Litig.,* 72 F.Supp.2d 283 (S.D.N.Y.1999), cited by the plaintiffs, held that a duty to update prior statements may exist when a statement becomes misleading because of a subsequent event, *id.* at 291-92, but in this case the complaint alleges that all of the plaintiffs had already entered into irrevocable purchase agreements before March 30, 2000, Complaint ¶ ¶ 47-48, 52-53. Accordingly, no duty to disclose the alleged information could have existed at the relevant time by the complaint's own terms. These facts make it unnecessary to consider the sufficiency of the pleading under the PSLRA and First Circuit precedent. Finally, paragraph 86(k) alleges that the defendants failed to disclose the material fact that Acadia was insolvent "at and after February 8, 2000."This allegation lacks the necessary particularly in that no allegation concerning the source of this information is made. To the extent that the allegation may be assumed to rely on any of the factual allegations of insolvency included in prior subsections of paragraph 86, it fails for the reasons discussed above in connection with those subsections.

**\*18** Paragraph 86(l) alleges that the defendants failed

to disclose a material fact "by failing to advise Plaintiffs that at a yet undetermined date in the fiscal quarter ending March 30, 2000, that [sic] Acadia National Health Systems, Inc. lost a substantial customer or customers causing the consolidated sales revenues of Acadia to drop approximately 50%."First, this allegation does not identify any representation rendered false, inaccurate, incomplete or misleading by the claimed omission, and it therefore fails for that reason alone. Next, the allegation fails because it concerns information not available by the very terms of the allegation until after the plaintiffs had made their investments. Finally, the allegation fails because it lacks the necessary particularity and cites no source for the information given or the plaintiffs' belief that the information is true.

Paragraph 86(m) alleges that the defendants omitted a material fact by failing to provide the plaintiffs with Acadia's Form 10QSB for the period ended December 31, 1999 which was filed with the SEC on February 18, 2000 but not delivered to the plaintiffs until a date after March 7, 2000. This report allegedly disclosed "a material adverse event in the form of declining sales, rising operating expenses, operating losses for the three month period then ended of $760,482" and various other specific information. Advest argues that the document at issue was a public document "apparently disclosed to Plaintiffs *prior* to the closing on April 26, 2000."Advest Motion at 23. However, Advest does not identify any section of the complaint or the accompanying documents that establish disclosure of this document to the plaintiffs before the closing, and my review of the complaint has not located any such allegation. In addition, the relevant time for disclosure would appear to be before the plaintiffs made their irrevocable purchases, not before the closing of the offering. The basic problem with paragraph 86(m) is that it fails to identify any representation made false, inaccurate, incomplete or misleading by the information in the February 18, 2000 Form 10QSB. This omission takes on particular significance here because the general rule is that there is no duty to disclose public information. *See, e.g., Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 517 (7th Cir.1989) ("It is pointless and costly to compel firms to reprint information already in the public domain."); *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323 (7th Cir.1988) ("The securities laws require the disclosure of information that is otherwise not in the public domain ."); *In re Kulicke & Soffa Indus., Inc. Sec. Litig.,* 697 F.Supp. 183, 186 (E.D.Pa.1988) ("It is clear that defendants owed no duty to disclose

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

information already available to the public which is part of the total mix of information available to the reasonable investor."). Indeed, the CPOM informs potential investors that they "can read the Company's past and future SEC filings over the Internet at the SEC's web site," giving the address; "read and copy any document filed by the Company at its public reference facilities" in New York City, Washington, D.C., and Chicago; or obtain copies from the SEC at a given address or telephone number. CPOM at [ii].

**\*19** Having concluded for the foregoing reasons that the defendants are entitled to dismissal of Count V of the complaint, I need not reach the other arguments made in support of the motion.

### C. The State Statutory Claims

Count II alleges violation of 32 M.R.S.A. § 10401, which provides: "A person may not offer or sell any security in this State unless the security is registered under this Act, the security or transaction is exempt under this Act or the security is a federal covered security." A transaction is exempt if it does not involve "any public offering within the meaning of the United States Securities Act of 1933, Section 4(2) [15 U.S.C. § 77d(2) ] ..., including ... any transaction exempt from registration with the United States Securities and Exchange Commission under ... Rule 506."32 M.R.S.A. § 10502(2)(R). I have concluded that the complaint concerns such an offering and accordingly the defendants are entitled to dismissal of Count II.

Count VI alleges violation of 32 M.R.S.A. § 10201, which prohibits the use of fraud, untrue statements, material omissions, or deceptive practices in connection with the offer or sale of any security. Although the Maine Law Court has not yet considered this issue, the defendants contend that dismissal of this claim is required if Count V, alleging parallel claims under federal law, is dismissed. Advest Motion at 28-29; Acadia Motion at 23. I do not find it necessary to base my recommendation on this theory. For the reasons set forth in my discussion of Count V above, I conclude that the complaint fails to comply with the requirements of Fed.R.Civ.P. 9(b)[FN11] on this issue, *see Bohrmann v. Maine Yankee Atomic Power Co.,* 926 F.Supp. 211, 222 (D.Me.1996) (citing *Romani* ), and accordingly I recommend that it be dismissed.

FN11. The Maine rule is identical. M.R.

Civ. P. 9(b).*See also Stevens v. Bouchard,* 532 A.2d 1028, 1030 (Me.1987) (application of Rule 9(b)).

### D. State Common Law Claims

Counts VII-IX of the complaint allege state common-law claims of fraud, negligent misrepresentation and breach of contract. The defendants seek dismissal of these claims and, in the alternative, ask the court to decline to exercise jurisdiction over these claims pursuant to 28 U.S.C. § 1367(c)(3). Advest Motion at 29-30 & n.21; Acadia Motion at 23-25. The plaintiffs "agree that the state law claims will have to be pursued in state court if the securities law claims are dismissed."Plaintiffs' Objection at 27. Accordingly, I recommend that the court decline to exercise jurisdiction over these counts pursuant to section 1367(c)(3), which provides:
The district courts may decline to exercise supplemental jurisdiction over a claim raised under subsection (a) [establishing federal court jurisdiction over state-law claims that are so related to federal-law claims raised in the same action that they form part of the same case or controversy] if-

(3) the district court has dismissed all claims over which it has original jurisdiction.

### IV. Conclusion

For the foregoing reasons, I recommend that the defendants' motions to dismiss be GRANTED as to Counts I-VI of the complaint and that the court decline to exercise jurisdiction over the remaining counts.

### NOTICE

**\*20** *A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 16
Not Reported in F.Supp.2d, 2001 WL 800064 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

*waiver of the right to de novo review by the district*
*court and to appeal the district court's order.*

D.Me.,2001.
Goodwin Properties, LLC v. Acadia Group, Inc.
Not Reported in F.Supp.2d, 2001 WL 800064
(D.Me.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1990 WL 260674 (S.D.N.Y.), Fed. Sec. L. Rep. P 95,681
**(Cite as: Not Reported in F.Supp.)**

**C**

Shalom v. **AdvancedMarketingTechnology** Corp.
S.D.N.Y.,1990.

United States District Court, S.D. New York.
SHALOM
v.
**ADVANCEDMARKETINGTECHNOLOGY**
CORP., et al.
**No. 88 Civ. 5497 (PNL).**

July 13, 1990.

Opinion

LEVAL, District Judge.

**\*1** This is an action for securities fraud, common law fraud, and breach of contract. Defendants **AdvancedMarketingTechnology** ("Amtech") and its principal, Keith Greenberg, move to compel arbitration, or, in the alternative, to dismiss.

*Background*

The gravamen of the complaint is that plaintiff Israel Shalom was fraudulently induced by defendants to invest in an electronic merchandising system. The system consisted of an interactive video kiosk and an assembly of electronic components (hereinafter the "kiosk"). The kiosk was designed to display an electronic catalog of merchandise and to permit customers to purchase merchandise using major credit cards, without sales personnel.

In 1986, Shalom entered into an "investment contract" with defendants involving a kiosk. According to Shalom, the "investment contract" was composed of two documents, a Purchase Agreement and a Maintenance and Service Agreement, signed by Shalom and Greenberg, on behalf of Amtech. The complaint alleges that the Purchase Agreement was entered into on or about July 18, 1986. Annexed to the Complaint is an unsigned copy of the Purchase Agreement. Shalom was to buy a kiosk for $125,000, payable within ninety days. The botton of the Purchase Agreement indicates that Shalom accepted delivery of the kiosk on September 15, 1986.

The Maintenance and Service Agreement ("MSA"), a

five year agreement dated September 15, 1986, provided that Amtech would locate and install the kiosk purchased by Shalom, maintain it, and select the products to be marketed by the system, as well as service consumers' orders for products. Amtech would receive revenues from the product and pay third-party costs and expenses incurred in operating the kiosk. In return for its services, Amtech was to receive 10% of the gross revenues derived from the kiosk. The MSA also provided that it was the "complete and exclusive statement of the agreement between the parties, which supersedes and merges all prior proposals, understandings, and all other agreements, oral and written, between the parties relating to the subject matter of this agreement." MSA at 9.

Finally, the MSA contained an arbitration clause.

16. The parties shall attempt to settle amicably all disputes arising out of or in connection with this Agreement, including the making, interpretation or breach thereof. The parties agree that any dispute arising hereunder shall be submitted to binding arbitration in New York, New York in accordance with the rules and procedures of the American Arbitration Association before a panel of three arbitrators.

Shalom alleges that at the time he entered into the arrangement, Amtech and Greenberg knew, but did not disclose to Shalom, that the kiosk purportedly sold to Shalom did not exist, and that Amtech could not sell or deliver a kiosk to Shalom. Complaint ¶ 8.

Further, Shalom alleges that Greenberg promised Shalom, apparently orally, that Amtech would pay the principal and interest on Shalom's loan from Israel Discount Bank until the loan was completely repaid. Complaint ¶ 7. Shalom alleges that Amtech made these payments until October, 1987, but then refused to make any further payment, in breach of the promise. Shalom also alleges that Amtech failed to pay revenues and profits from the operation of the kiosk, apparently in breach of the MSA.

**\*2** On or about October 6, 1987, defendant Greenberg reported to Shalom that his kiosk, known as ESVCS 201, was operational in the Duluth airport.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1990 WL 260674 (S.D.N.Y.), Fed. Sec. L. Rep. P 95,681
**(Cite as: Not Reported in F.Supp.)**

Shalom alleges that this representation was false, and that no kiosk has ever been operational in the Duluth airport location.

On August 5, 1988, Shalom filed this action, seeking damages in the amount of $125,000. The complaint alleges common law fraud, breach of contract, and violations of § 10(b) of the Securities Exchange Act of 1934 and § 17(a) of the Securities Act of 1933.

### Discussion

Defendants move to stay this action and compel arbitration, or, in the alternative, to dismiss this action under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

The parties agree that the contract (or contracts) governs the issue of whether the dispute is arbitrable.[FN1] It is well-settled that doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, including ambiguities in the construction of the contract language itself. *Moses H. Cone Memorial Hospital v. Mercury Const., 460 U.S. 1, 103 S.Ct. 927, 941 (1983).* Arbitration should be not denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Chevron U.S.A. v. Consolidated Edison Co. of N.Y., 872 F.2d 534, 537 (2d Cir.1989)* (citations omitted). *See also* 9 U.S.C. § 2 (indicating Congress's intention of presuming validity of arbitration clauses).

Defendants argue that section 16 of the MSA, a relatively broad arbitration clause, requires arbitration of all disputes "arising out of or in connection with this Agreement, including the making, interpretation or breach thereof," and that all of plaintiff's claims must accordingly be submitted to an arbitrator. Plaintiff responds that the claim here does not arise out of failure to maintain or service the kiosk, but rather out of the fact that the kiosk did not exist. Accordingly, plaintiff argues that the dispute is not arbitrable, for it relates only to the Purchase Agreement, not the MSA.

I agree with defendants that the arbitration clause can be interpreted to cover this dispute. The securities fraud and common law fraud claims alleged in the complaint both involve the making of the MSA, for Shalom alleges that he would not have entered into the MSA or the Purchase Agreement (both parts of the "investment contract") but for defendants'

fraudulent misrepresentations about their kiosk program. These claims clearly are connected with the "making" of the MSA.

The breach of contract claim clearly arises under the MSA and is therefore arbitrable under section 16 of the MSA. The complaint alleges that Amtech failed, *inter alia,* to pay revenues and profits from the operation of the kiosk, in violation of a provision of the MSA.

Moreover, plaintiff alleges in his complaint that in entering into the Purchase Agreement and MSA, plaintiff purchased a single, "investment contract." *See, e.g.,* Complaint ¶ 5; Opposition Brief at 3. Plaintiff contends that the Purchase Agreement would have been worthless to him without the MSA, and that he was expected by Amtech's promoters, as a typical investor, to accept the MSA option together with the Purchase Agreement.

**\*3** Without concluding that the two documents together form one investment contract, plaintiff's argument indicates, at least, that plaintiff believed he was entering into a single agreement which consisted of two interrelated documents. Further, the MSA states that it "merges" all other prior proposals, understandings, agreements among the parties relating to the subject matter of the agreement. Plaintiff's attempt to avoid the arbitration clause in the MSA by arguing that the two documents are completely distinct and concern separable subject matters is unconvincing. The motion to compel arbitration of the claims against Amtech is granted.[FN2]

### Conclusion

The motion to compel arbitration of plaintiff's claims against the corporate defendant, Amtech, is granted. The action against Amtech is stayed pending completion of the arbitration. On the other hand, it does not appear that Greenberg, the individual defendant, who is not a party to the MSA or the Purchase Agreement, has the right to compel plaintiff to forego a court action for suit against him. The parties have not addressed this issue. The parties are hereby directed to brief the issue. Papers shall be submitted within ten (10) days of this order.

SO ORDERED.

FN1. Neither party argues that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                      Page 3
Not Reported in F.Supp., 1990 WL 260674 (S.D.N.Y.), Fed. Sec. L. Rep. P 95,681
**(Cite as: Not Reported in F.Supp.)**

arbitration clause itself is unenforceable for any reason. *See Shearson/American Express, Inc., v. McMahon,* 107 S.Ct. 2332 (1987).

FN2. Because I find that the parties must submit this case to arbitration, I need not rule on the motion to dismiss the complaint.

S.D.N.Y.,1990.
Shalom v. Advanced Marketing Technology Corp.
Not Reported in F.Supp., 1990 WL 260674 (S.D.N.Y.), Fed. Sec. L. Rep. P 95,681

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 1844710 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C

Sharma v. Oriol
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Dave SHARMA and Transportation, & Transit Associates, Inc., Plaintiffs,
v.
Jose Maria ORIOL, Patentes Talgo S.A. and Talgo America, Inc., Defendants.
**No. 05 Civ. 2727(SAS).**

Aug. 3, 2005.

Barry B. Langberg, Deborah D. Drooz, Allan S. Cohen, Strook & Strook & Lavan L.L.P., Los Angeles, California, for Plaintiffs.

Sharon Katz, Paul Spagnoletti, Lorilee A. Vaughan, Davis Polk & Wardwell L.L.P., New York, New York, for Defendants.

SCHEINDLIN, J.

## I. INTRODUCTION

**\*1** Defendants Jose Maria Oriol, Patentes Talgo S.A. ("Patentes Talgo") and Talgo America, Inc. ("Talgo America") move to compel arbitration of a slander claim brought by Dave Sharma and Transportation and Transit Associates, Inc. ("TTA Inc."). Because this claim falls within the scope of an arbitration provision incorporated by reference into a sales contract among the parties, defendants' motion to compel arbitration is granted.

This court has diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code. Sharma is a citizen of New York and TTA Inc. has its place of business in New York, while Patentes Talgo has its place of business in Spain and Talgo America has its place of business in Seattle, Washington.[FN1] The amount in controversy exceeds $75,000.[FN2]

> FN1.See First Amended Complaint ("Compl.") ¶¶ 1, 3, 4.

> FN2.See id. ¶ 7.

## II. BACKGROUND

On March 16, 2000, Sharma, Chief Executive Officer of TTA Inc., and principal member and manager of Transportation & Transit Associates, LLC ("TTA LLC"), entered into two agreements pertaining to the sale of TTA LLC: (1) the LLC Interests Purchase Agreement ("Purchase Agreement") and (2) the First Amended and Restated Limited Liability Co. Agreement ("Operating Agreement").[FN3] The Purchase Agreement, among sellers Sharma and TTA Inc. and buyers Patentes Talgo, a Spanish company, and Talgo America, its American subsidiary, provided for the sale of TTA LLC in six phases.[FN4] The Operating Agreement, which included all the same parties with the exception of Patentes Talgo, established the manner in which TTA LLC would be run in the transition period before the sale was completed.[FN5]

> FN3.See id. ¶ 1.

> FN4.See The LLC Interests Purchase Agreement ("Purchase Agreement") ¶ 2.1, Ex. 1 to Declaration of Sharon Katz [defendants' attorney] in Support of Defendants' Motion to Compel Arbitration ("Katz Decl.").

> FN5.See First Amended and Restated Limited Liability Co. Agreement ("Operating Agreement") ¶ 1, Ex. 2 to Katz Decl.

On October 6, 2004, after completing five phases of the sale, the parties to the Purchase Agreement entered into a new contract, the Amended Joint Sale Agreement (the "AJSA"), which incorporated by reference the Purchase Agreement and Operating Agreement and set out the manner in which the final phase of the sale would be conducted.[FN6]

> FN6.See Amended Joint Sale Agreement ("AJSA") ¶ 1, Ex. 3 to Katz Decl.

The First Amended Complaint (the "Complaint") alleges that on or about December 14, 2004, Oriol, C.E.O. of Talgo America and Vice Chairman of Patentes Talgo, convened a dinner meeting of TTA LLC employees, among others, during which he made the following alleged defamatory statements: FN7

FN7. *See* Compl. ¶ 11.

1. Sharma/TTA Inc. deliberately inflated/overstated TTA LLC's profits, thus making the sale of TTA LLC fraudulent.
2. Based on Sharma/TTA Inc.'s misrepresentations, Talgo paid $49,000,000 for a company that is essentially worthless.
3. Talgo has been "ripped off."
4. Sharma/TTA Inc. was "fleecing the company." FN8

FN8. *See id.* ¶ 12.

The Complaint further alleges that at a subsequent meeting, on February 21, 2005, Patentes Talgo's director, Juan José Nárdiz Amurrio, stated:
5. Dave Sharma/TTA Inc. committed fraud in connection with the sale of TTA LLC.
6. Sharma/TTA Inc. conspired with Patentes Talgo's former C.E.O., Francisco ("Paco") De Lorenzo to commit fraud in connection with the sale of TTA LLC. FN9

FN9. *See id.* ¶ 15.

**\*2** On February 22, 2005, the following day, Amurrio allegedly repeated, at a meeting attended by TTA LLC employees and others, that
7. Dave Sharma and/or TTA Inc. committed fraud in connection with the sale of TTA LLC.
8. Sharma/TTA Inc. conspired with Patentes Talgo's former C.E.O., Francisco ("Paco") De Lorenzo to commit fraud in connection with the sale of TTA LLC. FN10

FN10. *See id.* ¶ 17.

Defendants contend that the arbitration provision contained in the Operating Agreement is incorporated by reference into the AJSA and covers Sharma's allegations of slander. The Operating Agreement reads, in relevant part:
Unless otherwise specifically provided in this Agreement, in the event that any dispute arises between the parties pertaining to the subject matter of this Agreement, and the parties, through their senior management, are unable to resolve such dispute within a reasonable time through negotiations and mediation efforts by senior executives of the parties, such dispute shall be resolved as set forth in this Section ... by binding arbitration. FN11

FN11. Operating Agreement ¶ 12.1.

Defendants invoke the AJSA's incorporation clause which specifies that "the Purchase Agreement and the Operating Agreement are incorporated by reference and form a substantive part of this Agreement." FN12

FN12. AJSA ¶ 1.

### III. LEGAL STANDARD

The determination of whether a dispute is arbitrable under the Federal Arbitration Act (the "FAA") comprises two questions: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." FN13 To find a valid agreement to arbitrate, a court must apply the "generally accepted principles of contract law." FN14 "[A] party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such obligation." FN15 A court should consider only "whether there was an objective agreement with respect to the entire contract." FN16

FN13. *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Amer. Corp.,* 246 F.3d 219, 226 (2d Cir.2001) (quotation omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1844710 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN14.*Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845 (2d Cir.1987).

FN15.*Id.*

FN16.*Id.*

Because there is "a strong federal policy favoring arbitration ... where [ ] the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability."FN17Thus, the Second Circuit has emphasized that

FN17.*Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co.,* 307 F.3d 24, 28 (2d Cir.2002) (quotation marks and citations omitted).

any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Accordingly, [f]ederal policy requires us to construe arbitration clauses as broadly as possible. We will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.FN18

FN18.*Collins & Aikman Prods. Co. v. Building Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995).*Accord WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997).

However, although federal policy favors arbitration, it is a matter of consent under the FAA, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."FN19

FN19.*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir.2001) (quotation omitted).

The Second Circuit has established a three-part inquiry for determining whether a particular dispute falls within the scope of the arbitration agreement.FN20*First,*"a court should classify the particular clause as either broad or narrow."FN21*Second,* if the clause is narrow, "the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause ."FN22"Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview."FN23*Third,* if the arbitration clause is broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it' " FN24 or "[i]f the allegations underlying the claims 'touch matters' covered by the parties' ... agreements." FN25In making this determination, courts must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." FN26

FN20.*See id.*

FN21.*Id.*

FN22.*Id.* (quoting *Rochdale Vill., Inc. v. Public Serv. Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)).

FN23.*Id.*

FN24.*Id.* (quoting *Collins,* 58 F.3d at 23).

FN25.*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs, Inc.,* 369 F.3d 645, 654 (2d Cir.2004) (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l Inc.,* 198 F.3d 88, 99 (2d Cir.1999)).*See also ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.,* 307 F.3d 24, 34 (2d Cir.2002) ("[W]hen parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated."(quoting *Louis Dreyfus,* 252 F.3d 225) (internal citation omitted).

Not Reported in F.Supp.2d, 2005 WL 1844710 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN26.*JLM Indus. v. Stolt-Nielsen S.A.,* 387 F.3d 163, 174 (2d Cir.2004) (citation and quotation marks omitted).

IV. DISCUSSION

A. Conflicts Within the Purchase Agreement

**\*3** While acknowledging the Operating Agreement's arbitration clause, Sharma argues that (1) the arbitration clause is ineffective because the Purchase Agreement, also incorporated into the AJSA, contains conflicting provisions providing for the resolution of disputes by arbitration and by adjudication; (2) Patentes Talgo, which was not a party to the Operating Agreement, may not invoke the arbitration clause contained in that Agreement; and (3) even if the arbitration clause is incorporated into the AJSA, Sharma's slander claims are not covered by that clause.FN27

FN27.*See* Memorandum of Law in Opposition to Motion to Compel Arbitration ("Sharma Opp.") at 2, 3.

The arbitration provision in the Operating Agreement calls for arbitration "in the event that any dispute arises between the parties pertaining to the subject matter of *this* Agreement."FN28 Although this suit arises under the AJSA (not the Operating Agreement), the Second Circuit has held that when an arbitration provision in an agreement is incorporated into a later contract, the scope of the provision is extended to cover disputes arising out of the later contract-in this case, the AJSA.FN29 Thus the arbitration clause is valid and controlling.

FN28. Operating Agreement ¶ 12.1 (emphasis added).

FN29.*See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 48-49 (2d Cir.1993) (holding that unless an incorporated arbitration clause can extend to disputes arising out of the later contract, it would be "almost impossible to incorporate any arbitration clause into a second agreement").

However, the AJSA also incorporates the Purchase Agreement, which provides that
*subject to the provisions of Exhibit A, Section 3,* any suit, action or proceeding against any party to this Agreement arising out of or relating to this Agreement shall be brought in any Federal court located in Rochester, New York, and each of the parties hereby submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding.FN30

FN30. Purchase Agreement ¶ 13.8, Ex. 2 to Declaration of Deborah D. Drooz [Sharma's attorney] in Support of Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration ("Drooz Decl.") (emphasis added).

Exhibit A requires that "if the dispute is not resolved ... within fifteen (15) days after the Respondent's receipt of the Dispute Notice, the dispute shall be resolved by binding arbitration ."FN31 Sharma argues that these two references create an ambiguity that is then imported into the AJSA.

FN31. Ex. A ¶ 3(b) to Purchase Agreement, Drooz Decl.

To the extent that there is an internal conflict in the dispute resolution clauses of the Purchase Agreement it is rendered moot by the AJSA's termination clause. It states that "by their signatures below, Seller, Buyer, Dave Sharma, and Company hereby terminate the Purchase Agreement and all exhibits to the Purchase Agreement, except to the extent specifically provided herein."FN32 Because the AJSA terminates the Purchase Agreement (except where specifically provided otherwise), the terms of the Operating Agreement are controlling. Sharma concedes that the Operating Agreement establishes that disputes pertaining to it are "clearly required to be submitted to arbitration."FN33

FN32. AJSA ¶ 7.

FN33. Sharma Opp. at 6.

### B. The Arbitration Provision's Applicability to Patentes Talgo and Oriol

A "broadly-worded arbitration clause which is not restricted to the immediate parties may be effectively incorporated by reference into another agreement."[FN34] Because the arbitration provision of the Operating Agreement is "not restrictively worded by referring to the immediate parties to that contract by name," it may be incorporated into the AJSA.[FN35]

> FN34. *Progressive,* 991 F.2d at 48.

> FN35. *Id. See also Intertec Contracting A/S v. Turner Steiner Int'l, S.A.,* No. 98 Civ. 9116, 2000 WL 709004, at *9 (S.D.N.Y. May 31, 2000)* (contrasting broadly-worded arbitration clauses like that in *Progressive* to those that specifically name the parties to be bound by the clause); Operating Agreement ¶ 12.1 (calling for arbitration "in the event that any dispute arises between the parties").

**\*4** As a party to the AJSA, Patentes Talgo has the power to invoke the incorporated arbitration provision. Finally, Oriol, as CEO of Talgo America and Vice Chairman of Patentes Talgo, may invoke the arbitration provision as an agent of the parties that entered into the AJSA.[FN36]

> FN36. *See Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1360 (2d Cir.1993) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement.").*See also Dassero v. Edwards,* 190 F.Supp.2d 544, 547 (W.D.N.Y.2002) (holding that an agent of party to a contract may invoke contract's arbitration clause when involved in a dispute relating to the contract).

### C. The Scope of the Arbitration Clause

In order to decide whether the slander allegations are subject to arbitration, the court must review the arbitration provision to determine whether it is broad or narrow. The "paradigm of a broad clause" is one that submits to arbitration "[a]ny claim or controversy arising out of or relating to th[e] agreement."[FN37] The arbitration clause here uses the phrase "pertaining to the subject matter," which is the functional equivalent of "arising out of or relating to th[e] agreement."[FN38] Therefore, the Operating Agreement's arbitration provision is broad, and the dispute is presumed to be arbitrable.

> FN37. *Collins,* 58 F.3d at 20. *Accord Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 27-28 (2d Cir.1995) (holding that the phrase "any controversy or claim arising under or in relation to this order or contract" indicates a broad arbitration clause).

> FN38. Operating Agreement ¶ 12.1.

To test the presumption that a defamation claim is arbitrable, courts inquire whether the "story" told by the allegedly defamatory statement is about a matter related to the contract.[FN39] In *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* the defendant sought to compel arbitration of a defamation claim.[FN40] Morganton was accused of making four defamatory statements to Leadertex's customers: Leadertex was "(1) generally dishonest in its business practices, (2) incapable of supplying conforming goods to manufacturers, (3) in the practice of selling defective goods, and (4) guilty of attempting to defraud Jones New York [a company that had rejected goods shipped by Morganton] by shipping it defective goods."[FN41] The court held that each of these statements "implicates matters beyond the contractual performance of the parties" because "none of these representations is about the contract between Morganton and Leadertex, which set forth only their agreement for Morganton to provide dyeing and warehousing services to Leadertex."[FN42] Noting that the alleged defamation addressed Leadertex's general qualities rather than the specific relationship between Leadertex and Morganton, the court concluded that the defamation

was not "about" the contract between Morganton and Leadertex, and therefore was not covered by the arbitration agreement. The ruling implied, however, that the defamatory statements need merely be about the contractual relationship between the parties in order to satisfy the "touch" standard.

> FN39.*See Leadertex,* 67 F.3d at 28 ("The exact content of the allegedly defamatory statement must be closely examined to see whether it extends to matters beyond the parties' contractual relationship.").

> FN40. The arbitration clause mandated that "any controversy or claim arising under or in relation to this order or contract, or any modification thereof, shall be settled by arbitration."67 F.3d at 27.

> FN41.*Id.* at 28.

> FN42.*Id.*

The *Leadertex* court cited a line of cases in which employers invoked arbitration clauses within employment contracts to compel arbitration of slander claims.FN43When the alleged defamatory statements referenced an employee's ability as an employee, the conditions of his employment, or the circumstances of his termination, the claims were found to be arbitrable.FN44 By contrast, assertions relating to the employee's character but not directly to his or her employer's contractual obligations-for example that the employee was the "company drunk"-were not.FN45Hence, to determine the arbitrability of defamation claims in the employment context, courts examine the story told by the allegedly defamatory statements, and determine if this story is about the contractual relationship between the parties.

> FN43.*See id.*

> FN44.*See Fleck v. E.F. Hutton Group, Inc.,* 891 F.2d 1047, 1052 (2d Cir.1989) (holding that a slander claim was arbitrable where a "significant issue" of employee's

"job performance" was implicated).*See also Webb v. Wellins,* No. 98 Civ. 1113, 1999 WL 31113, at *2 (N.D.N.Y. Jan. 21, 1999) (holding that "disputes concerning the conditions of [an employee's] employment and matters arising out of her termination" are matters covered by broad arbitration agreement in employment contract).

> FN45.*See McMahon v. RMS Elec., Inc.,* 618 F.Supp. 189, 192 (S.D . N.Y.1985).

**\*5** In this case, all of the defendants' allegedly defamatory statements refer either explicitly or implicitly to the sale of TTA LLC by Sharma and TTA Inc. to defendants Patentes Talgo and Talgo America. To varying degrees of specificity, each statement asserts that Sharma behaved fraudulently in connection with the sale. Nothing in the statements extends beyond the way in which the sale was entered into.FN46The statements thus concern a core issue of the contractual relationship between the parties-specifically, the fairness of the purchase price of TTA LLC.FN47 Accordingly, plaintiffs' claim is arbitrable.

> FN46.*See* statements 1 and 2, Compl. ¶ 12 (asserting that Sharma falsely inflated the purchase price of TTA LLC); statement 3, Compl. ¶ 12 (asserting that Sharma stole from Talgo); statement 4, Compl. ¶ 12 (asserting that Sharma "was fleecing the company" and implying either that Sharma stole from Talgo or that Sharma drained TTA LLC of its value in anticipation of the sale); statements 5 and 6, Compl. ¶ 15 (explicitly accusing Sharma of fraud in connection with the sale of TTA LLC); statements 7 and 8, Compl. ¶ 17 (same).

> FN47.*See JLM,* 387 F.3d at 176 ("[A]llegations that the price terms set forth in ... contracts have been artificially inflated as a result of [a] price-fixing conspiracy" involve a "core issue of the contracts between the parties.").

## V. CONCLUSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1844710 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

For the reasons set forth above, defendants' motion to compel arbitration is granted. The parties are ordered to enter binding arbitration pursuant to section 12.1 of the Operating Agreement. The Clerk of the Court is directed to close this motion [# 9 on the docket sheet] and this case.

SO ORDERED:

S.D.N.Y.,2005.
Sharma v. Oriol
Not Reported in F.Supp.2d, 2005 WL 1844710 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 1

Not Reported in F.Supp., 1995 WL 746382 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.)**

C

Sodemo, S.A. v. Chase Manhattan Bank, N.A.

S.D.N.Y.,1995.

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

SODEMO, S.A., Plaintiff,

v.

THE CHASE MANHATTAN BANK, N.A. and

The Chase Manhattan Bank (USA), Defendants.

**No. 95 CIV. 2944 (DLC).**

Dec. 15, 1995.

David A. Cutner, Debra I Resnick, Cutner & Associates, P.C., New York City, for plaintiff.

Kent T. Stauffer, The Chase Manhattan Bank, N.A. Litigation Division, New York City, for defendant.

COTE, District Judge.

**\*1** Plaintiff Sodemo, S.A. ("SODEMO"), a Swiss corporation with its offices and place of business in Switzerland, brings this diversity action against defendants the Chase Manhattan Bank, N.A. and the Chase Manhattan Bank, USA (collectively "Chase"), for fraud and misrepresentation, quantum meruit, unjust enrichment, misappropriation of trade secrets, and conversion in connection with a contract among the parties executed on January 19, 1994. Chase now moves this Court for an Order compelling arbitration of this dispute pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-4, and an arbitration clause contained in the agreement. For the reasons given below, Chase's motion is granted.

BACKGROUND

The following facts are undisputed.

On January 19, 1994, SODEMO and Chase entered into a written letter agreement (the "Agreement") in which SODEMO was to provide Chase consulting services in connection with Chase's credit card operation. In exchange for such services, Chase was to pay SODEMO $45,000 per month, as well as additional contingent amounts based on formulas tied to "Net Future Value", "Value Factor", and "Terminal Value Factor" as defined in the Agreement. The Agreement was effective retroactively as of November 1, 1993.

The Agreement defines "Termination Date" in Section 4 as the date occurring "immediately upon the giving of written notice by either SODEMO or Chase to the other or without notice immediately upon Chase's failure or refusal to make on time and in full any payment called for by [the Agreement]." In Section 5, the Agreement defines the rights and obligations of the parties after termination as follows:

The termination of this Agreement shall not affect or impair any rights, obligations, or liabilities of any party hereto which may accrue prior to such termination or which, under the terms of this Agreement, continue after termination.... The provisions of this Section 5 shall survive the termination of this Agreement.

In addition, the Agreement contains the following arbitration provision:

The parties agree to submit any dispute hereunder to final and binding arbitration under the International Commercial Arbitration Rules of the American Arbitration Association, such arbitration to take place in New York with costs of arbitration to be awarded by the arbitrator.

The Agreement also contains a standard merger clause, and a choice of law provision selecting Delaware law as governing, with the exception of Delaware conflicts law.

On March 15, 1995, Chase sent notice of termination of the Agreement to SODEMO by letter indicating that "[p]ursuant to Section 4 of the Agreement, this constitutes official notice that Chase hereby terminated the Agreement, effective immediately on March 31, 1995."On March 17, 1995, Chase wrote SODEMO that "[p]ursuant to Section 3 of the agreement, Chase has calculated the Net Future Value of the intellectual properties transferred to Chase under this agreement during 1994....

Since the Net Future Value is less than five million dollars, the 'value factor' under the Agreement, for 1994, is O." On the same day, Chase received a Demand for Payment from SODEMO, indicating that $612,000 was past due and owing by Chase to SODEMO pursuant to the Agreement. SODEMO's Demand for Payment was based upon an interpretation of the Value Factor under the Agreement different from Chase's, one which placed the Value Factor at 1.0 rather than O.

**\*2** On March 21, Chase wrote to SODEMO that, "[s]ince Chase did not make payment in full to SODEMO on November 1, 1994, pursuant to _Section 4_, the agreement was terminated as of that date."The letter requested SODEMO therefore to return to Chase the $225,000 Chase had paid to SODEMO subsequent to November 1. Chase now contends that the March 21 letter was not an admission that the Agreement had terminated on November 1; rather, it was intended to take issue with SODEMO's assertion that the Value Factor had been fixed at 1.0.

On April 26, 1995, SODEMO filed a Complaint against Chase alleging causes of action for fraud and misrepresentation, quantum meruit, unjust enrichment, misappropriation of trade secrets, and conversion. SODEMO's claims are based on the theory that Chase from the beginning regarded the Agreement as having been terminated in November 1994, yet devised a scheme to defraud SODEMO by representing to SODEMO that the Agreement continued to be in full force until March 21, 1995, while concealing its intention to avoid payment of its obligations to SODEMO by later asserting that Chase's own default had terminated the Agreement as of November 1, 1994. SODEMO also asserts that Chase's March 21 computation of the amount due upon a November termination is incorrect, although it admits that its claims for amounts due under the Agreement are subject to arbitration.

Chase now moves this Court for an Order staying or dismissing the action and compelling arbitration pursuant to the Agreement's arbitration clause and the Federal Arbitration Act, _9 U.S.C. §§ 1_-_4_.

### DISCUSSION

The Federal Arbitration Act provides that a written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

_9 U.S.C. § 2_. As a method of alternative dispute resolution, federal policy strongly favors arbitration. _Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16, 19 (2d Cir. 1995)_(citing _David L. Threlkeld & Co. v. Metallgesellschaft LTD., 923 F.2d 245, 248 (2d Cir.)_, _cert. dismissed,501 U.S. 1267 (1991)_). The policy favoring arbitration "is even stronger in the context of international business transactions," where considerations of facilitating the efficiency of such transactions and avoiding the expense, uncertainty, and often vast expenditure of time involved with litigation are particularly compelling. _Threlkeld, 923 F.2d at 248_. Regardless of the nature of the transaction at issue, however, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."_Mose H. Cone Memorial Hospital v Mercury Construction Corp., 460 U.S. 1, 24-25 (1983)_; _accord Leadertex v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 25 (2d Cir. 1995)_. Arbitration clauses are therefore to be construed as broadly as possible, and arbitration will be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."_Threlkeld, 923 F.2d at 250_ (internal quotations and citations omitted); _accord Leadertex, 67 F.3d at 27_.

**\*3** Of course, federal law "does not require parties to arbitrate when they have not agreed to do so"; it simply requires courts to enforce an arbitration clause, like any other contract clause, in accordance with its terms. _Volt Info. Sciences, Inc. v. Board of Trustees of Leyland Stanford Junior University, 489 U.S. 468, 478 (1989)_."[A] party cannot be required to submit to arbitration any dispute which he has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not agreed so to submit." *Leadertex,* 67 F.3d at 27 (internal quotations and citations omitted).

In deciding whether a dispute must be submitted to arbitration, a court must initially make the following inquiries. First, a court must determine whether the arbitration clause is broad or narrow. If broad, there is a presumption that the claims are arbitrable. Second, if narrow, the court must go on to determine whether the dispute nonetheless falls within the arbitration clause. *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 63-64 (2d Cir. 1983); *cf.* *Collins & Aikman,* 58 F.3d at 20. In determining whether a clause is broad or narrow, a court must consider possible "words of limitation which would indicate a narrower clause" and "the tone of clause as a whole." *Prudential Lines,* 704 F.2d at 64.

In the instant case, the arbitration clause explicitly binds the parties to arbitration of "any dispute hereunder." Insertion of the term "hereunder" has the effect of limiting slightly the parties' duty to arbitrate. All disputes arising under the Agreement are to be arbitrated; those that are collateral to it are not. *See* *Rochdale Village, Inc. v. Public Serv. Employee's Union, Local No. 80,* 605 F.2d 1290, 1296 (2d Cir. 1979)(construing arbitration clause for "any and all disputes hereunder"). There is, moreover, no indication in the language or tone of the clause that arbitration was limited to specific types of disputes arising under the Agreement. The clause is therefore "broad, but it is not unlimited." *Id.* 1296. As noted above, because the clause is broad, "there is a presumption that the claims are arbitrable." *Collins & Aikman,* 58 F.3d at 20.

It is true that SODEMO's Complaint artfully avoids pleading in contract, and instead seeks to hold Chase liable in tort and quasi contract. But [i]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, [a court must] focus on the allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters covered by the parties' ... agreements, then those claims must be arbitrated,

whatever the legal labels attached to them.

*Genesco Inc. v. T. Kakiuchi & Co., LTD.,* 815 F.2d 840, 846 (2d Cir. 1987); *accord* *Collins & Aikman,* 58 F.3d at 20-21.

Here, SODEMO admits that the initial question to resolve in this case is "whether and when" the Agreement terminated. This question requires construction and application of the Agreement's termination and payment provisions, and thus, clearly arises "under" the Agreement and is covered by the arbitration clause. *See* *Rochdale,* 605 F.2d at 1296. If the arbitrator decides that the Agreement was not terminated until March 31, then SODEMO's claims are moot. Even if the arbitrator decides that the Agreement terminated the previous November, however, SODEMO's tort claims nonetheless arise under the Agreement since its theory of recovery is that Chase fraudulently engaged in a scheme to deprive SODEMO of the benefits of the Agreement. In effect, SODEMO wants the benefit of the Agreement and Chase has agreed that SODEMO is entitled to the benefit of the Agreement through March 31. All that remains, therefore, is for an arbitrator to decide to what benefits SODEMO is entitled under the terms of the Agreement. *See, e.g.,* *Genesco,* 815 F.2d at 856 (claim for unjust enrichment is predicated on contractual duty to pay and therefore "arises under" the contract). The fact that SODEMO's claims are pled in tort rather than contract does not make them any less arbitrable. *Collins,* 58 F.3d at 23. Thus, the instant dispute is "arbitrable because it require[s] an interpretation of the contract's own terms." *See* *Prudential Lines,* 704 F.2d at 64 (citing *Rochdale Village, Inc. v. Public Serv. Employee's Union, Local No. 80,* 605 F.2d 1290 (2d Cir. 1979)).

CONCLUSION

**\*4** Chase's motion to compel arbitration is accordingly granted. This action is therefore stayed pending arbitration.

SO ORDERED:

S.D.N.Y.,1995.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 746382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Sodemo, S.A. v. Chase Manhattan Bank, N.A.
Not Reported in F.Supp., 1995 WL 746382
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westendorf v. Gateway 2000, Inc.
Del.Ch.,2000.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Melissa WESTENDORF on behalf of herself and all
others similarly situated, Plaintiff,
v.
GATEWAY 2000, INC., Defendant.
**No. 16913.**

March 16, 2000.

Kevin Gross and Jeffrey S. Goddess of Rosenthal,
Monhait, Gross & Goddess, Wilmington, Delaware.
Of Counsel: Deborah R. Gross of the Law Offices
Bernard M. Gross, P.C., Philadelphia, PA; Max
Berger and Seth Lesser of Bernstein Litowitz Berger
& Grossmann, New York, NY. Attorneys for
Plaintiff.
Allen M. Terrell, Jr. and Robert J. Stearn, Jr. of
Richards, Layton & Finger, Wilmington, Delaware.
Of Counsel: Robert M. Rader and Robert A. Berger
of Winston & Strawn, Washington, D.C. Attorneys
for Defendant.

MEMORANDUM OPINION
STEELE, V.C.
**\*1** Melissa Westendorf ("Plaintiff") bought her friend
a Gateway computer, which at plaintiff's request,
Gateway delivered directly to her friend. Several
months later, the same friend purchased a Gateway
computer, which he requested be delivered directly to
plaintiff. Plaintiff received and retained that
computer.

As part of its computer package, Gateway offers
Internet access through its Gateway.net service. The
software needed for Gateway.net access comes with
the computers, and only Gateway owners can utilize
the service. After registering for Gateway.net service,
plaintiff and many other Gateway customers
allegedly began experiencing numerous and serious
difficulties when attempting to use the service. Citing
those problems, plaintiff brings this purported class
action arguing that she and the members of purported
class paid for services they did not receive.

With the relevant computer shipments, Gateway
included its Standard Terms and Conditions
Agreement, which contains an arbitration clause.
Plaintiff argues she is not bound by the arbitration
clause because as a non-purchasing user of the
computer she never expressly agreed to arbitration.
Alternatively, she claims that because a second
agreement relating to software service does not
include an arbitration clause she is not required to
submit her claims to arbitration. Conversely,
Gateway argues plaintiff is bound by the arbitration
clause and, as such, she can not properly bring this
claim in this Court.

Because plaintiff, as an intended beneficiary of her
friend's computer purchase, accepted the benefits of
that purchase and otherwise met the requisite
conditions for the agreement to become effective, I
find she is bound by the arbitration clause. The
existence of a second agreement that fails to mention
arbitration does not prevent me from reaching this
conclusion because I find that that agreement relates
to and therefore must be read in conjunction with the
standard agreement. Accordingly I dismiss this
action.

I. Legal Standard

In evaluating defendant's motion to dismiss, I assume
the truthfulness of all well-pleaded, nonconclusory
allegations found in the complaint and extend the
benefit of all reasonable inferences that can be drawn
from the pleading to the non-movant, plaintiff.[FN1]A
claim cannot be dismissed unless under no reasonable
interpretation of the facts alleged in the complaint
(including reasonable inferences) could the plaintiff
state a claim for which relief might be
granted.[FN2]Notwithstanding Delaware's permissive
pleading standard, I am free to disregard mere
conclusory allegations made without specific
allegations of fact to support them.[FN3]

FN1.*Loudon v. Archer-Daniels-Midland
Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

FN2.*Delaware State Troopers Lodge v.
O'Rourke,* Del. Ch., 403 A.2d 1109, 1110
(1979) ("A complaint should not be
dismissed upon such a motion unless it

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2000 WL 307369 (Del.Ch.), 41 UCC Rep.Serv.2d 1110
**(Cite as: Not Reported in A.2d)**

appears to a certainty that under no set of facts which could be proved to support the claim would the plaintiff be entitled to relief.")

FN3.*Wolf v. Assaf,* Del. Ch., C.A. No. 15339, mem. op., 1998 Del. Ch. LEXIS 101, at *3-4, Steele, V.C. (June 16, 1998).

## II. Facts

Gateway 2000, Inc.("Gateway"), a Delaware corporation, is a seller and manufacturer of computers and computer products. It also provides Internet access with the computers it sells. Gateway invites Gateway computer purchasers to register for Internet access through a Gateway.net account that includes one e-mail address, 24-hour technical support, and full Internet access. Only owners of Gateway computers are eligible for the full Gateway.net service. Plaintiff and the purported class members elected to subscribe to Gateway.net. FN4

FN4. The purported plaintiff class consists of all persons in the United States who purchased Gateway's Internet access service since January 1, 1998.

**\*2** Gateway began marketing Gateway.net to its customers in November 1997. Shortly thereafter, Gateway began to receive customer complaints regarding connection difficulties, receipt of bills for long distance calls made without customer knowledge, and inability to access e-mail. Plaintiff claims these problems arose because: (a) Gateway's access numbers were constantly busy or unavailable; (b) Gateway lacked the capacity to adequately handle registrations of new customers; and (c) Gateway neither designed nor maintained the net in accordance with generally accepted industry standards. Plaintiff argues that she and members of the purported class therefore paid for services that they did not receive.

Plaintiff came to own her Gateway computer in a manner that is likely unique within the purported class. On or about December 9, 1997, plaintiff ordered a personal computer and accessories from Gateway. Plaintiff requested that she be billed for this purchase at her Philadelphia, Pennsylvania address, but that her order be shipped directly to Brian Pawlak at his address in Milwaukee, Wisconsin. Gateway included numerous documents with the computer and accessories it shipped to Pawlak. Most notable for our purposes is that Gateway's Standard Terms and

Conditions Agreement ("Standard Terms and Conditions") was included in that shipment.

Several months later, on August 3, 1998, Pawlak separately ordered another Gateway computer and accessories, and also ordered the Gateway.net Internet service. Pawlak placed this order from his Milwaukee address, but requested that Gateway ship these products to plaintiff at her Philadelphia address. It is not entirely clear what motivated plaintiff and Pawlak to buy and "exchange" computers in the manner in which they did.

In any event, plaintiff received the computer paid for by Pawlak, and used Pawlak's account number to register for Gateway.net service on August 24, 1998. Despite using Pawlak's account number, plaintiff registered under her own name, which was substituted on the billing account. Importantly, the computer Pawlak sent to plaintiff also included Gateway's Standard Terms and Conditions Agreement.

Gateway claims it routinely includes its Standard Terms and Conditions Agreement with each computer sold and shipped to its customers. Plaintiff does not dispute that claim, nor does she argue that she did not receive the agreement in the shipment paid for by Pawlak. The Standard Terms and Conditions Agreement provides that the Gateway customer may, at his or her option, return the computer to Gateway, for any reason, for a full refund (less shipping charges) within thirty days of receipt. The agreement also states that retention of the computer beyond the thirty-day period of free trial use equates to an acceptance of Gateway's proposed terms and conditions.FN5 Plaintiff retained the computer beyond thirty days after delivery.

FN5.*See Hill v. Gateway 2000, Inc.,* 105 F.3d 1147 (7th Cir.), *cert. denied,* 522 U.S. 808 (1997).

Paragraph ten of Gateway's Standard Terms and Conditions Agreement constitutes a dispute resolution clause. It reads, in pertinent part, "[a]ny dispute or controversy arising out of or relating to this Agreement, its interpretation or any related purchase shall be resolved exclusively and finally by arbitration."

**\*3** With her computer, plaintiff received a second "Terms and Services" agreement that pertained to purchasers, like plaintiff, who elected to sign up for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 2000 WL 307369 (Del.Ch.), 41 UCC Rep.Serv.2d 1110
**(Cite as: Not Reported in A.2d)**

the Gateway.net Internet access service ("Service Terms and Conditions Agreement").[FN6] This agreement does not mention arbitration nor does it incorporate the Standard Terms and Conditions Agreement by reference.

> [FN6.] Plaintiff also tells the Court that software from Gateway and third parties is included in Gateway computers, with each separate software application subject to its own "Terms and Conditions." Pl .'s Br. at 6 n. 5. It seems, therefore, that plaintiff's Gateway computer came in a box that also included several other agreements the terms of which were not discussed in detail by the parties.

Plaintiff did not submit her claim to arbitration; instead, she filed a complaint in this Court on January 22, 1999 alleging breach of contract and violations of the Delaware Consumer Fraud Act.[FN7]Plaintiff asks this Court to enjoin Gateway from accepting new customers for its Gateway.net Internet services and to order Gateway to refund payment of the purported class's Gateway.net Internet access services fees. Gateway argues that plaintiff's filing in this Court violated the parties' agreement to arbitrate claims of the sort now at issue. In response, plaintiff argues she did not purchase the second computer therefore the agreement does not cover her. She also argues that the Service Terms and Conditions Agreement, which does not include an arbitration clause, trumps the Standard Terms and Conditions Agreement.

> [FN7.]6 *Del. C.* § § 2511-2526.

### III. Analysis

*A. Preliminary findings regarding the Standard Terms and Conditions Agreement.*

In a separate action, with different underlying facts, a Gateway customer challenged the enforceability of the arbitration clause in the Standard Terms and Conditions Agreement arguing that it was not binding on him because he was not aware of it when he ordered the computer. The 7th Circuit rejected that argument, however, and found the agreement enforceable as written.[FN8]Judge Easterbrook, writing for the unanimous panel, noted "[b]y keeping the computer beyond 30 days, the [buyers] accepted Gateway's offer, including the arbitration

clause."[FN9]Undeniably, plaintiff in the present case retained the computer and accessories for more than thirty days. The same rationale, therefore, applies to this plaintiff as in the case before the 7th Circuit.

> [FN8.]*Hill v. Gateway 2000, Inc.,* 105 F.3d 1147 (7th Cir.), *cert. denied,*522 U.S. 808(1997).

> [FN9.]*Id.* at 1150.

Further, I find that the Internet access service is a "related purchase" falling within the scope of the agreement's arbitration clause. The arbitration clause broadly covers "[a]ny dispute or controversy arising out of or relating to [the Standard Terms and Conditions Agreement], its interpretation or *any related purchase.*" [FN10]Since Gateway made its Internet access service available only to Gateway computer owners this service was directly tied to the initial purchase of the computer and accessories.

> [FN10.] Emphasis added.

*B. Delaware Law and Federal Law hold there is a presumption favoring arbitration.*

The United States Supreme Court has held there is a presumption favoring arbitration unless: "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[FN11]Likewise, the Delaware Supreme Court has stated that "the public policy of this state favors the resolution of disputes through arbitration."[FN12]The Court of Chancery has noted that "there is a presumption in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[FN13]Accordingly, Delaware's Uniform Arbitration Act is consistent with the Federal Arbitration Act, and its "strong federal policy in support of arbitration."[FN14]

> [FN11.]*United Steelworkers of America v. Warrior Gulf Navigation Co .,* 363 U.S. 574, 582-83 (1960) (cited and quoted with approval in *Worthy v. Payne,* Del. Ch., C.A. No. 16027, ltr. op. at 2, Steele, V.C., (Feb. 12, 1998); *United Engineers & Constructors, Inc. v. IMO Indus., Inc.,* Del. Ch., C.A. No. 12611, mem. op. at 14,

Not Reported in A.2d                                                                                                Page 4
Not Reported in A.2d, 2000 WL 307369 (Del.Ch.), 41 UCC Rep.Serv.2d 1110
**(Cite as: Not Reported in A.2d)**

Hartnett, V.C (Feb. 11, 1993), and *Action Drug Co. v. R. Baylin Co.,* Del. Ch., C.A. No. 9383, mem. op. at 6, Berger, V.C. (June 19, 1989)).

FN12.*Worldwide Insur. Group v. Klopp,* Del.Supr., 603 A.2d 788, 790 (1992).

FN13.*Worthy v. Payne,* Del. Ch., C.A. No. 16027, ltr. op. at 2, Steele, V.C., (Feb. 12, 1998).

FN14.*Steinberg v. Prudential-Bache Sec., Inc.,* Del. Ch., C.A. No. 8173, 1986 WL 5024 at *4,* Jacobs, V.C. (April 30, 1986).

*C. Plaintiff is bound by the arbitration clause because she knowingly accepted the benefits of Pawlak's 1998 purchase and contract made on her behalf.*

**\*4** Gateway argues that plaintiff as Pawlak's donee beneficiary takes Pawlak's obligations along with his rights. To support this argument, Gateway cites three Delaware cases. After reviewing those cases, it is not patently clear to me that a donee beneficiary necessarily takes the donor's obligations along with his rights. The cases that Gateway cites all involve clarification of third party beneficiary rights, but none discuss third party beneficiary obligations.[FN15]Despite Gateway's urging to do so, I am unwilling to conclude that those cases require that an intended third party beneficiary must assume the donor's contract obligations along with his rights in every instance.

FN15.*Foreign Mart, Inc. v. Brinton,* Del. Ch., C.A. No. 5475, 1978 WL 8415 at *3,* Marvel, C. (July 27, 1978) (finding that plaintiff may enforce by injunction the restrictive language contained in lease it was not a party to because it was a third party beneficiary of that lease); *Farmers Bank of the State of Delaware v. Howard,* Del. Ch., 276 A.2d 744, 745 (1971) (holding that a contract made for the benefit of a third party is enforceable in Delaware and that a third party may sue to enforce a promise made for his benefit, even though he is a stranger to both the contract and the consideration); *Insituform of North America, Inc. v. Chandler,* Del. Ch., 534 A.2d 257, 270 (1987) (explaining that to create a benefit in favor of third party, benefit must be intended

and material part of contract's purpose).

In this case, however, specific facts exist that warrant both the passing of the donor's rights *and* the donor's obligations to the donee. "[O]ne who knowingly accepts the benefits intended as the consideration, coming to him or her under a contract voluntarily made by another in his or her behalf, becomes bound by reason of such acceptance to perform his or her part of the contract."[FN16]That logic applies here. I do not know why plaintiff and Pawlak "exchanged" computers as they did, but it is clear that plaintiff knowingly accepted the computer and accessories delivered to her. She promptly used the computer and signed up for Internet access in her own name. In every way, plaintiff asserted ownership over that computer and her Gateway.net account.

FN16. 17B C.J.S. § 631 (1999) (citing *Shelter Ins. Companies v. Frohlich,* Neb.Supr., 498 N.W.2d 74 (1993) (finding that Frohlich, a passenger injured in a car accident who became a third party beneficiary of the driver's insurance policy, was bound by a subrogation clause contained in the insurance policy because Frohlich accepted a contractual benefit)).

Specifically regarding arbitration clauses, Professor Williston writes, "[w]here the contract contains an arbitration clause which is legally enforceable, the general view is that the beneficiary is bound by it to the same extent that the promisee is bound."[FN17]There is nothing unique about this case that would justify departure from that general rule.

FN17.SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS, § 37:24, at 154 (4th ed.2000).(citing *Borsack v. Chalk & Vermillion Fine Arts, Ltd.,* 974 F.Supp. 293 (S.D.N.Y.1997) (the right of a third person for whose benefit a promise is made is affected with all the infirmities of the agreement as between the parties; thus, language limiting application of such clauses to nonsignatories so long as such persons were intended beneficiaries of the contract).

Equity requires the same result. "There are times when a court of equity must look at the entire relationship between 'all' parties, a logical construct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 5
Not Reported in A.2d, 2000 WL 307369 (Del.Ch.), 41 UCC Rep.Serv.2d 1110
(Cite as: Not Reported in A.2d)

of that relationship and the parties' suggestion of a fair mechanism for resolving disputes."[FN18]Plaintiff's argument that she is not bound by the arbitration clause because she is not a "purchaser" strikes me as somewhat disingenuous. Given the relationship between Gateway and plaintiff-plaintiff bought a Gateway computer in December of 1997, and received a Gateway computer in August of 1998, which she quickly used and retained over thirty days-equity dictates that plaintiff be bound by the arbitration clause just as someone who actually bought, received and retained the same computer is bound. Accordingly, I find plaintiff's argument that she was not a "purchaser" amounts to mere semantics, and hold that she is bound by the arbitration clause.

> FN18.*Worthy v. Payne,* Del. Ch., C.A. No. 16027, ltr. op. at 2, Steele, V.C., (Feb. 12, 1998).

*D. The absence of an arbitration clause in of Gateway's Service Terms and Conditions Agreement does not somehow undo the arbitration clause present in Gateway's Standard Terms and Conditions.*

Plaintiff argues that the Service Terms and Conditions Agreement is controlling, and since that agreement has no arbitration clause, plaintiff is not required to arbitrate her disputes. I find that this suggested result would run contrary to the intended interrelationship between the two agreements, and would contradict explicit public policy to interpret broadly arbitration clauses.

**\*5** In defining the scope of an arbitration clause, "the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."[FN19]"[A]rbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[FN20]

> FN19.*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985).

> FN20.*McMahan Securities Co. L.P. v. Forum Capital Markets L.P.,* 35 F.3d 82, 88 (2d Cir.1994) (quoting *S.A. Mineracao Da Trindale-Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 194-95 (2d Cir.1984).

When evaluating the effect of an arbitration clause that is present in only one agreement of a series of related agreements, courts have examined "the totality of circumstances," while also recognizing the policy concerns favoring arbitration.[FN21] Applying that analysis to this case, I find that Gateway was not required by law to include an arbitration clause in each separate agreement. "Where an arbitration clause is broad enough to encompass the disputed question, the court has no choice but to refer the controversy to arbitration in the agreed manner."[FN22]In this case, the arbitration clause is sufficiently broad enough to cover the dispute. In reaching this conclusion I examined the totality of the circumstances, and considered the manner in which plaintiff came to own her Gateway computer, the fact that she retained it for over thirty days, and the language in the arbitration clause expressly stating the clause covered "any related purchase" especially telling.

> FN21.*Com-Tech Associates v. Computer Assoc.,* 753 F.Supp. 1078 (E.D.N.Y.1990), *aff'd by*938 F.2d 1574 (1991) (finding dispute arbitrable where the arbitration clause contemplated arbitration of disputes "in connection with, or in relation to" the relevant partnership agreement).*See also Reliance Nat'l Insur. Co. v. Seismic Risk Insur. Services,* 962 F.Supp. 385 (S.D.N.Y.1997) (holding that arbitration clause in program manager agreement between parties under which broker was to solicit, underwrite, and bind earthquake insurance on behalf of insurer governed claims under related profit commission agreement even though that latter agreement contained no arbitration clause).

> FN22.*U.S. Titan, Inc. v. Guangzhou Men Hua Shipping Co., Ltd.,* 182 F.R.D. 97, 101-02 (S.D.N.Y.1998) (also adding that "it has been repeatedly held that even a dispute regarding the satisfaction of a condition precedent to a contract will be referred to arbitration if it may reasonably be said to come within the scope of an arbitration clause" (citations omitted)).

IV. Conclusion

A long-standing equitable maxim states that equity looks to the intent rather than to the form. While

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6
Not Reported in A.2d, 2000 WL 307369 (Del.Ch.), 41 UCC Rep.Serv.2d 1110
**(Cite as: Not Reported in A.2d)**

examining the totality of circumstances in this case, I kept that maxim in mind. Accordingly, I find that plaintiff is bound by the arbitration clause at issue. Therefore, this action is dismissed.

IT IS SO ORDERED.

Del.Ch.,2000.
Westendorf v. Gateway 2000, Inc.
Not Reported in A.2d, 2000 WL 307369 (Del.Ch.), 41 UCC Rep.Serv.2d 1110

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.