**Exhibit A**

**LOOKING FOR PALLADIN, LLC**
**SUBSCRIPTION AGREEMENT**

Looking For Palladin, LLC.
4 Pine Hill Drive
Katonah, NY 10536

**Re: LOOKING FOR PALLADIN, LLC**

Dear Ladies and Gentlemen:

You have advised the undersigned ("Subscriber") that: (a) a minimum of $420,000 ranging to a maximum of $700,000 in Class A membership interests (the "Interests" or the "Units") are being offered in LOOKING FOR PALLADIN, LLC, a Delaware limited liability company (the "Company"), (b) the Company will be operated in accordance with the Operating Agreement (the "Operating Agreement") furnished to the undersigned herewith; (c) the Company was organized for the purpose of financing, producing, and exploiting the feature-length motion picture currently entitled *Looking for Palladin* (the "Picture" or "Film"), as is more fully set forth in the Private Placement Memorandum of the Company (the "Memorandum") which is being furnished to the undersigned herewith; (d) the minimum Interest which may be purchased by any subscriber will be one Unit of $70,000 per Unit; and (e) subscriptions for less than one Unit or for fractional Units are available at the discretion of the Managers of the Company.

1. <u>Subscription</u>.

(a) Subject to the terms and conditions hereof, the undersigned hereby tenders this Subscription together with payment of the subscription price for each Unit being purchased (the "Funds") by check, certified check or cashier's check payable to "LOOKING FOR PALLADIN, LLC " in the amount of $70,000 per Unit.

(b) Tender of the aforesaid Funds, together with this Agreement and the signature page to the Operating Agreement (the "Documents") shall be made by delivery of same to the Company, who shall deposit the Funds in its operating account. Subscriptions for the minimum number of Units have already been received by the Company and Funds will not be deposited in escrow.

2. <u>Accredited Investors</u>. Subscriptions will be accepted only from persons who are accredited investors, as such term is defined under the Securities Act of 1933, as amended. The undersigned represents that he qualifies as an accredited investor in accordance by satisfying one of the requirements set forth below:

(a) in the case of a Subscriber who is an individual, check each box below which is applicable:

/____/   (i) Net worth, or joint net worth with that of a spouse, at the time of purchase of the Units, exceeds USD$1,000,000.

/____/   (ii) Individual income was in excess of USD$200,000 in each of the two most recent years or joint income with that of spouse was in excess of USD$300,000 in each of those years and Subscriber reasonably expects to reach the same income level in the current year.

(b) in the case of a Subscriber which is not an individual, check each of the boxes which is applicable:

/____/   (i) Its total assets exceed USD$5,000,000.

/____/   (ii) All equity owners of the Subscriber meet the criteria set forth in (a)(i) or (a)(ii) or (b)(i) of this Section 3.

3. <u>Subscriber's Representations</u>. The Subscriber represents and warrants that:

(a) Subscriber, if an individual, is at least 21 years of age and of sufficient legal capacity to execute this Subscription Agreement.

(b) Subscriber has been furnished with and has carefully read this Subscription Agreement, the Operating Agreement attached thereto and the Private Placement Memorandum and is aware that there are substantial risks incident to the purchase of Unit(s) **INVESTMENT IN THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE UNDERTAKEN ONLY BY PERSONS WHO CAN AFFORD THE RISK OF LOSS OF THEIR ENTIRE INVESTMENT.**

(c) Subscriber can bear the economic risks of this investment and can afford a complete loss of its investment and Subscriber has: (i) sufficient liquid assets to pay the full purchase price for the Unit(s) representing its interest in the Company; and (ii) adequate means of providing for its current needs and possible personal contingencies, and no present need for liquidity of its investment in the Company.

(d) Subscriber has been represented by such legal counsel, accountant and/or other business advisor (each one an "Advisor" and together "Advisors"), each of whom has been personally selected by Subscriber, as Subscriber has found necessary to consult concerning this transaction. Subscriber has, or Subscriber and such Advisor together have, such knowledge and experience in financial and business matters that the Subscriber is, or the Subscriber and the

Advisor together are, capable of evaluating the merits and risks of investment in the Company and of making an informed investment decision.

(e) The Managers have made available to Subscriber, and its Advisor, if any, prior to the date hereof, the opportunity to ask questions of, and to receive answers from the Managers concerning the terms and conditions of the offering of Units in the Company and to obtain information necessary to verify the accuracy of the information provided.

(f) Subscriber understands that the discussion of the tax consequence arising from an investment in the Company is general in nature, and the tax consequences to the Subscriber may depend on its circumstances. Neither the Company, the Managers, nor their principals or advisors assume any responsibility for the tax consequences to Subscriber of any investment in the Company. Subscriber is relying solely upon the advice of its Advisors, if any, and upon its own knowledge with respect to such tax matters.

(g) Subscriber is aware that the Company has no financial or operating history and that the Units are speculative investments involving a high degree of risk.

(h) Subscriber is aware that there is no existing public or other market for the Units and it is not anticipated that there will be any market for the Units in the foreseeable future.

(i) If the Subscriber is a corporation, partnership, trust or other entity, it represents that: (i) it is duly organized, validly existing and in good standing under the laws of a state of the United States and has all the requisite power and authority to invest in the Unit(s); (ii) such investment has been duly authorized by all necessary action on behalf of Subscriber; and (iii) this Subscription Agreement has been duly executed and delivered on behalf of Subscriber and constitutes a legal, valid and binding agreement of Subscriber.

(j) Subscriber's execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. Subscriber is acquiring the Unit(s) for its own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part.

(k) The foregoing representations and warranties are true and accurate as of the date hereof and, unless Subscriber specifically advises the Managers in writing to the contrary prior to the date of the Closing, will be true and correct as of the date of the Closing, and each such representation and warranty shall survive the Closing.

4. <u>Survival and Indemnification</u>. The representations, warranties, covenants, and agreements of Subscriber contained herein shall survive and continue in full force and effect after the Closing. Subscriber will indemnify and hold harmless the Company and the Managers, from any and all damages, losses, costs, and expenses (including reasonable attorneys' fees) which they, or any of them, may incur by reason of Subscriber's failure to fulfill any of the covenants, terms, and conditions of this Subscription Agreement or by reason of Subscriber's breach of any of its representations and warranties contained herein.

5. <u>Acceptance of Subscription</u>. If the Subscription Agreement is not accepted by the Company on or before March 31, 2007, by depositing in the mail on or before that date, postage prepaid, addressed to Subscriber at the address set forth below (or otherwise actually delivered to the Subscriber) a copy of this Subscription Agreement executed by the Company, then this Subscription Agreement and all of its agreements hereunder shall automatically be terminated and revoked.

6. <u>Further Assurances</u>. Subscriber shall, at the Managers' request, execute and deliver such other instruments and take such other action which the Managers may reasonably request to effectuate the intent and purpose of this Subscription Agreement.

7. <u>Governing Law</u>. This Subscription Agreement shall be governed by and construed in accordance with laws in the State of Delaware.

8. <u>Binding Effect; Assignment</u>. This Subscription Agreement and the representations and warranties contained herein shall be binding upon Subscriber's heirs, successors, and assigns and may not be assigned by Subscriber without the prior written consent of the Managers, and any attempted assignment without such consent shall be void.

IN WITNESS WHEREOF, Subscriber has executed this Subscription Agreement, this 17th day of July, 2006.

Number of Units: 1

Price per Unit: $70,000.00
Total Price: $70,000.00
($65,000.00 upon execution, $5,000.00 on or before October 2, 2006)

Aryeh Chen
Name (Please Print)

_____
Signature

1866 East 136h Street
Street Address

Brooklyn, NY 11229
City, State and Zip Code

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
Social Security or Employer ID No.

SUBSCRIPTION ACCEPTED:

LOOKING FOR PALLADIN, LLC

By: Pine Hill Productions, Inc., Manager
By: _____

By: Tousi Productions LLC, Manager

By: _____

5

IN WITNESS WHEREOF, Subscriber has executed this Subscription Agreement this 17th day of July, 2006.

Number of Units:  1

Price per Unit:    $70,000.00
Total Price:       $70,000.00
($65,000.00 upon execution, $5,000.00
 on or before October 2, 2006)

*Aryeh Chen*
Name (Please Print)

_____
Signature

1866 East 13th Street
Street Address

Brooklyn, NY 11229
City, State and Zip Code

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
Social Security or Employer ID No.

SUBSCRIPTION ACCEPTED:

LOOKING FOR PALLADIN, LLC

By: Pine Hill Productions, Inc., Manager

By: _____

By: Tousi Productions LLC, Manager

By: _____

5