**Exhibit B**

**OPERATING AGREEMENT**
**OF**
**LOOKING FOR PALLADIN, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

ARTICLE I

DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein);

(a) "Bridge Loan" shall mean a short-term loan which will be made by Pine Hill to the Partnership in the amount of up to $320,000).

(b) "Business Expenses" shall have the meaning specified in Section 6.04(c).

(c) "Certificate of Formation" shall mean the Certificate of Formation of LOOKING FOR PALLADIN, LLC as filed with the Delaware Secretary of State on June 8, 2006, as the same may be amended or restated from time to time.

(d) "Capital Account" as of any given date shall mean the capital account to be established and maintained for each Member in accordance with Section 5.03.

(e) "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

(f) "Class A Interests" shall mean the membership interests in the Company issued to all persons other than Managers, which entitle the holder to one vote per Class A Interest on all matters submitted for a vote of Members, and the share of profits, losses, and other distributions of the Company as set forth in Article VI.

(g) "Class A Member" shall mean each person to whom a Class A Interest is issued or their successors or assigns.

(h) "Class B Interests" shall mean the Membership Interests in the Company issued to Managers, which entitle the holder to one vote per Membership Interest on all matters submitted for a vote of Members, and the share of profits, losses and distributions of the Company as set forth in Article VI.

(i) "Class B Members" shall mean the Managers and their successors and assigns.

(j) "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(k) "Company" shall mean Looking For Palladin, LLC.

(l) "Contributed Capital" shall mean the total dollar amount contributed by Class A Members, which shall be no more than $910,000.00.

(m) "Deferments" shall mean payments to the cast and crew and other persons in connection with the Film, not to exceed $300,000 cumulatively, payable out of Gross Receipts after Class A Members have received a return of 100% of their capital contributions.

(n) "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year.

(o) "Distributable Cash" shall mean all capital, including income and unused Capital Contributions, after deducting appropriate Deferments.

(p) "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's profits, losses, and distributions of the Company's assets pursuant to this Operating Agreement and the Limited Liability Act of the State of Delaware, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

(q) "Economic Interest Owner" shall mean the owner of an Economic Interest.

(r) "Eligible Investments" shall mean certificates of deposit of United States banks, money market funds, interest bearing accounts or other similar short-term, highly-liquid investments; provided, however, that the Company funds may not be invested in tax-exempt securities.

(s) "Film" shall mean the motion picture to be produced by Company and distributed tentatively titled *Looking for Palladin*.

(t) "Fiscal Year" shall mean the company's fiscal year, which shall be the calendar year.

(u) "Gross Receipts" shall mean for the Film, all monies actually received by the Company for its own account from any source whatsoever (except the aggregate Capital Contributions) in connection with the sale, license, distributions

and other exploitation of the Film and ancillary rights related thereto throughout the world in perpetuity, in all media whether now known or hereafter devised, including, without limitation, theatrical and non-theatrical exhibition, broadcast television, cable, pay and satellite television, video cassettes and DVD's, CD-I, CD-ROM and all 3DO, and online, including, without limitation, over the Internet, and through commercial tie-ins and merchandising, soundtrack albums and music publishing and any collection in respect of insurance, and any damage awards or settlements relating to the foregoing.

(v) "Initial Closing Date" shall mean June 30, 2006.

(w) "LLCL" shall mean the Limited Liability Act of the State of Delaware as amended from time to time.

(x) "Managers" or "Managers" shall mean, unless otherwise specifically provided in this Operating Agreement, Pine Hill Productions, Inc. and Tousi Productions, LLC.

(y) "Member" shall mean each of the parties who execute a counterpart of this Operating Agreement as a member of the Company and each of the parties who may hereafter become Members.

(z) "Membership Interest" shall mean a Member's interest in the Company including such Member's Economic Interest and the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the LLCL.

(aa) "Pine Hill" shall mean Pine Hill Productions, Inc., a manager of the Company..

(bb) "Profits" and "Losses" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the accounting methods followed by the Company for income tax purposes.

(cc) "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

(dd) "Persons" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

(ee) "Reserves" shall mean, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Managers for working capital

3

and to pay taxes, insurance, debt service or other costs or expenses incident to the Company's business.

(ff) "<u>Talent Participations</u>" means any compensation measured by net proceeds or gross receipts of the Film which is paid or payable to any Person which grants rights, renders services or furnishes materials or facilities in connection with the development or production of the Film; provided that such term shall not include payments made in connection with the sale, distribution or exhibition of the Film; and shall be borne by the Managers and be deducted from their share of distributions from the Company.

(gg) "<u>Tousi</u>" shall mean Tousi Productions, LLC, a Manager of the Company.

(hh) "<u>Treasury Regulations</u>" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate of Formation and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

ARTICLE II

FORMATION OF COMPANY

2.01 <u>Name</u>. The name of the Company is LOOKING FOR PALLADIN, LLC.

2.02 <u>Formation</u>. On June 8, 2006 the Company was organized by executing and filing Articles of Organization with the Delaware Secretary of State in accordance with and pursuant to the Delaware State LLCL.

2.03 <u>Principal Place of Business</u>.  The Company shall establish a permanent principal place of business at such place or places as the Managers from time to time deems advisable.

2.04 <u>Term.</u> The term of the Company shall be the term set forth in the Articles of Organization, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the LLCL.

## ARTICLE III

## BUSINESS OF COMPANY

3.01 <u>Permitted Businesses</u>. The business of the Company shall be:

    (a) The development, production, and sale for distribution of the Film.

    (b) To accomplish any lawful business or purpose whatsoever and to engage in any lawful business, which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets; and

    (c) To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the LLCL. The Company shall engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

    (d) The Company shall own all right title and interest in the Film, including all sequels, and all other ancillary rights and products derived from the Film. All trademarks, trade names and copyrights shall be registered in the name of the Company.

## ARTICLE IV

## NAMES AND ADDRESSES OF MEMBERS

    The names and addresses of the Class A Members are as set forth on the signature pages hereof. The Class B Members are:

Pine Hill Productions, Inc.
4 Pine Hill Drive
Katonah, NY 10536

Tousi Productions, LLC.
65 Roebling Street, #102
Brooklyn, NY 11211

ARTICLE V

CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

5.01 Capital Contributions.

(a) The Company is hereby authorized to issue up to 13 Class A Interests and 8 Class B Interests. Class A Members shall make a capital contribution to the Company of $70,000 per Class A Interest. Class B Members shall contribute $10 per Class B Interest and have assigned to the Company the rights to produce and own the Film. The Managers may accept subscriptions for partial Class A Interests at their discretion. All capital contributions shall be made upon the execution of this Operating Agreement.

(b) The Company is initially offering ten (10) Class A Interests to investors. In the event the Managers decide, in their discretion, that the Company requires additional capital, the Managers shall have the right to issue up three additional Class A Interests at any time. It is understood that such additional financing will dilute the membership interests of the Members, and therefore it is agreed by the Managers shall offer to Class A Members the first option to contribute any additional funds. In the event that an amount greater than $910,000.00 is required for completion of the Film, the majority consent of Members Interests shall be required.

(c) There will be one or more closings on the sale of the Class A Interests (a "Closing" or "Closings") at which time subscriptions will be accepted and investors will be admitted to the Company as Class A Members. The first Closing will take place upon receipt of subscriptions for not less than $100,000 of Class A Interests (the "Initial Closing"). The Initial Closing must take place on or before June 30, 2006 (the "Initial Closing Date") or the offering will terminate, all subscription funds will be returned to the investors with interest and without deduction, and all subscriptions will be canceled. If the number of Class A Interests accepted at the Initial Closing is less than six Class A Interests, Pine Hill shall enter into a bridge loan agreement with the Company pursuant to which it shall advance the Bridge Loan to the Company in the amount of up to $320,000 as required to fund development and production of the Film. The Bridge Loan will bear interest at a floating rate equal to 1% above the prime rate of interest announced from time to time by Citibank, N.A., but in no event less than 6% per annum. The Bridge Loan will repaid with the proceeds of the offering. In the event the Bridge Loan is not repaid with the proceeds of this offering, the Bridge Loan shall be converted into Class A Membership Interests. The Bridge Loan will not be secured by a lien on the property of the Company.

(d) The Company shall continue to offer Class A Interests for a period which shall expire no later than March 31, 2007 (the "Offering Termination

Date"). Subsequent Closings will take place at the discretion of the Managers. All subscription proceeds will be deposited in the Company's operating account.

(e) Pine Hill is hereby issued 5 Class B Interests. Tousi is hereby issued 3 Class B Interests.

5.02 <u>Nature of Contributions</u>.  No Member shall be required or obligated (a) to contribute any capital to the Company other than as provided in Section 5.01 or 5.02 hereof, or (b) to lend any funds to the Company (except for Pine Hill's obligation to provide the Bridge Loan). Any interest earned on subscriptions deposited in the account shall be deemed to be income earned by the Company and shall not be deemed a Capital Contribution and, except as otherwise provided herein, no Member may withdraw his, her, or its, Capital Contribution.  None of the terms, covenants, obligations or rights contained in this Section is or shall be deemed to be for the benefit of any person or entity other than the Members and the Company, and no such third person shall under any circumstances have any right to compel any actions or payments by the Managers and/or the Members. The Company may utilize any or all Capital Contributions as they are made by Members for Company operations.

5.03 <u>Capital Accounts</u>

(a) A separate Capital Account will be maintained for each Member. Each Member's Capital Account will be increased by (1) the amount of money, if any, contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to); and (3) allocations to such Member of distributable distributions and Profits. Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to); and (3) allocations to the account of such Member of Company losses and deductions as set forth in the Treasury Regulations, taking into account adjustments to reflect book value.

(b) The manner in which Capital Accounts are to be maintained pursuant to this Section 5.03 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.

(c) Upon liquidation of the Company (or any Member's Membership Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account

7

all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidating distributions may be made in cash or property.

(d) Except as otherwise required in the LLCL (and subject to Sections 5.01 and 5.02), no Member shall have any obligation to restore all or any portion of a deficit balance in such Member's Capital Account.

## ARTICLE VI

### ALLOCATIONS, DISTRIBUTIONS, ELECTIONS, AND REPORTS

6.01 <u>Allocations of Income or Losses from Operations</u>. Income and losses from operations of the Company shall be allocated to Class A Members and the Class B Members in accordance .

6.02 <u>Allocations of Income or Loss from the Sale of Substantially all of the Assets of the Company</u>.

(a) Income or gain (but not losses) from the sale of all or substantially all of the assets of the Company shall be allocated as follows:

(i) To the extent that the Capital Accounts of the Class A Members are negative, income or gain shall first be allocated to the Class A Members until the Capital Accounts of the Class A Members (after giving effect to any allocation of gains pursuant to this Section) equals zero;

(ii) Next, to the extent the Class B Members have a negative balance in its Capital Account, income or gain shall next be allocated to the Class B Members until the Capital Account of the Class B Members (after giving effect to any allocation of gains pursuant to this Section) equals zero;

(iii) Next, any income or gain shall then be allocated to the Class A Members in amounts that shall cause the Capital Accounts of Class A Members to equal $70,000 per Class A Interest less all prior distributions made or credited to Class A Members (but not less than zero);

(iv) Next, any income or gain shall then be allocated to the Class B Members in amounts that shall cause the Capital Accounts of Class A Members to equal the capital contributions of the Class B members less all prior distributions made or credited to Class B Members (but not less than zero);

(v) The balance of any income or gain shall then be allocated to the Class A Members and Class B Members in amounts that shall cause the Capital Accounts of all the Class A Members to equal 50% of the total Capital Accounts of all Members after such allocations and after all allocations and distributions have been made. However, in the event that there are not distributions to be made to the Class B Members pursuant to Section 6.02(a)(iv), all remaining income and gain to be allocated pursuant to this Section 6.02(a)(v) shall be allocated to the Class A Members.

(b) Losses from the sale or disposition of all or substantially all of the Company's assets shall be allocated as follows:

(i) To each of the Members having positive Capital Account balances in the proportion that the positive balance of each such Member bears to the positive balances of all such Members having positive Capital Account balances, until such Capital Accounts are reduced to zero; and

(ii) The balance of any loss shall be allocated 50% to the Class A Members and 50% to the Class B Members.

6.03 Qualified Income Offset and Minimum Gain Provisions.

(a) Qualified Income Offset Provision. In the event, under any circumstances, the Capital Accounts of Class A Members are unexpectedly reduced to a negative balance, by reason of an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2) (ii)(d)(4), (5) or (6), so as to cause a Capital Account deficit for any Class A Member, then, notwithstanding any other provision of this Agreement, items of Company gain and income realized by the Company shall be specially allocated to the Class A Members in proportion to the amounts of their respective negative Capital Account balances until the portion of such negative Capital Account balances (which resulted from such adjustment, allocation or distribution) is offset in full. Any special allocations of items of income or gain pursuant to this Section 6.03(a) shall be taken into account in computing subsequent allocations of income pursuant to this Article VI so that the net amount and character of any items so allocated and the income or gain allocated to each Class A Member pursuant to this Article VI shall, to the extent possible, be equal to the net amount and character of the items that would have been allocated to each such Class A Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations or distributions had not occurred. This provision is intended as a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii) (d) and shall be construed so as to give effect to that intention.

(b) Minimum Gain Provisions. To the extent that any Member has a negative Capital Account balance as of the end of any taxable year of the

Company after giving effect to any distributions made or to be made with respect to such taxable year, and such negative balance exceeds such Member's share of "minimum gain" (as defined in Treasury Regulations promulgated under Section 704 of the Code) allocable to such Member as of the end of such taxable year, then an amount of income equal to such excess will be allocated to such Member. This Section 6.03(b) is intended to constitute a minimum gain charge back within the meaning of the Treasury Regulations under Section 704 of the Code and shall be construed so as to give effect to that intention. To the extent this minimum gain charge back would distort the allocations of income and losses as detailed in Section 6.03, the Managers are hereby authorized to make subsequent allocations of income and losses in any reasonable manner so as to eliminate any such distortion.

(c) The allocations of income and loss, as detailed in Article VI are intended to comply with the Treasury Regulations under Section 704 of the Code which require that allocations have substantial economic effect. The Managers are hereby authorized to adjust the allocations of income and loss in this Article VI to comport with the requirements of the Code, regulations or interpretations of the law, including the requirements of Code Section 704.

6.04 <u>Business Expenses</u>.

(a) The Managers shall be promptly reimbursed for any documented business expenses actually paid or incurred by any Manager at any time on behalf of the Company, including, without limitation, fees for outside legal and accounting services incurred prior to the date of this Agreement. Beginning on the Initial Closing Date and thereafter on the first day of each semi-annual reporting period, such expenses shall be billed directly to and paid by the Company when due with the exception of legal fees associated with the offering of Class A Interests, which will be paid by the Managers and deemed a Business Expense.

(b) In addition, the Company shall pay all taxes and any losses, damages and expenses related to a claim against the Company unless such claim results from the gross negligence or willful misconduct of the Managers.

(c) For the payment of the amounts payable by the Company pursuant to Section 6.04(a) and (b) (together "Business Expenses"), the Managers may:

(i) Recoup such expenses out of Capital Contributions;

(ii) Recoup such expenses out of Distributions of Gross Receipts; or

(iii) Borrow funds or utilize cash from reserves established for such purposes.

(d) Except for taxes and losses payable by the Company pursuant to Section 6.04(b), the Managers shall not incur on behalf of the Company and the Company shall not be liable for the payment of Business Expenses in excess of $25,000 in the aggregate.

(e) The Managers, in their sole discretion may elect to create a deferment pool out of which certain actors and/or key crew members shall receive Deferments. Such Deferments will be deferred compensation to allow the Film to be completed in accordance with its budget. A maximum of $300,000.00 shall be payable as Deferments.

6.05 Commissions. Neither the Company, the Managers, nor any person selling Class A Interests on behalf of the Company shall be paid or awarded, directly or indirectly, any finder's fees, commissions or other compensation to any person engaged for investment advice by a potential Member as an inducement to give the potential Member investment advice.

6.06 Repayment of Amounts Borrowed.

(a) In the event the Company borrows funds, or the Managers, any Member, or any other Person advances funds to the Company, the Company shall repay such borrowed funds or advances and any interest thereon in accordance with the terms of such borrowing or advance.

(b) A creditor who makes a non-recourse loan to the Company will not have or acquire, at any time as a result of making the loan, any direct or indirect interest in the profits, capital or property of the Company other than as a possible secured creditor.

6.07 Allocations of Gross Receipts to Reserves. The Managers may allocate an amount they consider reasonable to a reserve (the "Reserve"), which reserve the Managers shall maintain (i) to meet the funding obligations to the Film; (ii) to repay, subject to Section 6.06 above, the principal amount of, and interest on, any Company debt, and (iii) to provide for the payment of any Business Expenses. Any amounts so reserved which are not used shall be invested in Eligible Investments. The Managers may at any time (but in no event later than six (6) months after such funds were allocated to the Reserve) release any funds so reserved and any interest earned thereon or increment thereto and distribute them to the Members pursuant to the terms of this Agreement.

6.08 Allocations of Distributions.

(a) Distributions shall be made within 30 days after the end of each calendar quarter, or in the discretion of the Managers more frequently, for two (2) years commencing in the calendar quarter following the initial receipt of Gross Receipts by the Company, and within 30 days after the end of each semi-annual

11

period for the subsequent two (2) years, and within 30 days after the end of each year thereafter as follows:

(b) <u>Distributions.</u> The Company shall allocate cash available for Distribution from operations of the Company and from the exploitation of the Film from all worldwide sources and media now known or hereafter devised, and from the worldwide exploitation of all ancillary rights and products derived from the Film, and from all sources other than a sale of all or substantially all of the assets of the Company, or a dissolution of the Company ("Distributions from Operations"), in the following manner: (i) First, to Class A Members until they have received an amount equal to 100% of their Contributed Capital, it being understood that no Deferments shall be payable until distributions total 100% of Contributed Capital; (ii) Second, to Class A Members until they have received an additional amount equal to 15% of their Contributed Capital, it being understood that Gross Receipts shall be allocated on a <u>pari passu</u> basis 50% to the Class A Members' distributions and 50% to pay Deferments; (iii) Third, and next, all remaining cash available for distribution shall be allocated and paid 50% to Class A Members and 50% to the Class B Members.   All distributions to Class A Members shall be made *pro rata* and *pari passu* to the percentage of Class A Interests held by each Class A Member. All distributions to Class B Members shall be made *pro rata* and *pari passu* to the percentage of Class B Interests held by each Class A Member.

All Talent Participations payable to the cast and/or crew of the Film will be paid by the Managers from their share of distributions, if any.

(b) <u>Distributions Upon Sale or Dissolution.</u>  Cash available for distribution from the sale of all or substantially all of the Company's assets or any distribution upon dissolution of the Company shall be made as follows:

(i) First, to the Class A Members having positive balances in their Capital Accounts after having income or gain allocated pursuant to Section 6.02(a)(i) and Section 6.02(a)(iii) of this Agreement in an amount equal to such positive balances, in proportion to such positive balances, but not to exceed the amount initially contributed to the capital of the Company, plus 15% of such Member's Capital Contribution, less all previous distributions made in accordance with Section 6.04 (a) and this Section 6.04 (b);

(ii) Second, to the Class B Members and to the extent it has a positive balance in its Capital Accounts after having income or gain allocated pursuant to Section 6.02(a)(ii) in an amount equal to such positive balance, in proportion to such positive balance, but not to exceed the amount of Contributed Capital of all Class A Members, less all previous distributions made in accordance with Section 6.04 (a) and this Section 6.04(b);

(iii) Third, any remaining balance available for distribution shall be allocated to each of the Class A Members according to the percentage of Class A shares they have in the company, provided that the cumulative amount allocated to the Class A Members shall not exceed 50% of all allocations to the Members of the Company, and no less than 50% of all such Membership allocations of the income of the Company shall be allocated to the Class B Members.

(d) <u>Approval</u>. Any distribution of Company funds available for distribution shall require the approval of the Managers. If any distribution is made, the Managers shall at the time of such distribution, or in the report next following the distribution, notify the Members as to the source or sources of such distribution. The Managers shall not be obligated to distribute funds at any time if in the sole discretion of the Managers such funds are needed, or may reasonably be expected to be needed, for Company purposes.

(e) <u>Apportionment among Members</u>. All allocations of income, loss, deduction and credit to the Members hereunder, as well as allocations of distributions hereunder, shall be apportioned among them on the basis of the number of Interests owned by each Member as a percentage of the total number of Membership Interests of the same class as of the end of the taxable year for which such allocation has been made. Notwithstanding the foregoing, if during any taxable year of the Company there is a change in any Member's interest in the Company, each Member's allocation of any item of income, gain, loss, deduction or credit of the Company for such taxable year will be determined by (i) assigning the appropriate portion of each item to each day in the period to which it is attributable, and (ii) allocating the portion assigned to any such day among the Members in proportion to their interests in the Company at the close of such day.

(f) <u>Limitation Upon Distributions</u>. No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

6.09 <u>Accounting Principles</u>. The profits and losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis. It is intended that the Company will elect those accounting methods which provide the Company with the greatest tax benefits.

6.10 <u>Loans to Company.</u> Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company, all of which loans shall be treated by the Company in the same manner as loans from independent third parties.

6.11 <u>Records.</u> At the expense of the Company, the Managers shall maintain records and accounts of all operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

(a) A current list of the full name and last known business, residence, or mailing address of each Member and the Managers, both past and present;

(b) A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed,

(c) Copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years or if such returns or statements were not prepared for any reason, copies of the information and statements necessary to enable the Members to prepare their own federal, state and local tax returns for such period;

(d) Copies of the Company's past and present Operating Agreement and amendments;

(e) Copies of financial statements of the Company since formation;

(f) Minutes of every annual and special meeting;

(g) Any written consents obtained from Members for actions taken by Members without a meeting;

(h) A current statement of the capital contributions made by each Member specifying the amount of cash and the agreed value of other property received by the Company and the agreed value of services as a capital contribution that each Member has contributed to the Company;

(i) A statement of the cash, property and services that each Member has agreed to contribute or render to the Company in the future and of the principal balance outstanding under any promissory note payable in respect of a contribution, and of the amount of the capital contribution with which each such Member shall be credited upon receipt of such cash, property or services or any part thereof;

(j) Documents or other writings required to be made available to Members by this Operating Agreement.

6.12 <u>Reports.</u> Upon request, on or prior to April 1st of each year, a report shall be made available to each Member indicating its share of Company profits and losses for such year for federal income tax purposes. Simultaneously therewith, the Managers shall also make available to the Members a profit and loss statement for the preceding calendar

year, showing, in reasonable detail, revenues received and expenses, together with a balance sheet as at year end reviewed by the independent certified public accountants then servicing the Company and certified as being true and complete by the Managers.

6.13 <u>Returns And Other Elections</u>. For the sole purpose of representing the Company for determination of federal tax treatment of Company items under the Code, Pine Hill shall be designated as the Tax Matters Member. If such designation shall be found to be contrary to the Regulations promulgated by the Treasury Department, such Regulations shall control the designation of the Tax Matters Member. The Tax Matters Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

ARTICLE VII

<u>RIGHTS AND DUTIES OF THE MANAGERS</u>

7.01 <u>Identity and Replacement</u>. The Company shall be managed by the Managers The Managers cannot be replaced by the Members or Managers. All actions by the Managers shall require a majority vote with each Manager having one vote for each Class B Interest held by the Manager.

7.02 <u>Management</u>. The business and affairs of the Company shall be managed by its Managers, Pine Hill Productions, Inc. and Tousi Productions, LLC, which shall have the authority, from time to time, by a majority vote, to appoint such officers of the Company, as the Managers deem appropriate. The Managers shall direct, manage and control the business of the Company to the best of its abilities. Except for situations in which the approval of the Members is expressly required by the Agreement or non-waivable provisions of applicable law, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

7.03 <u>Powers of the Managers</u>. Without limiting the generality of Section 7.02, the Managers shall have power and authority in each instance, on behalf of the Company:

(a) To borrow money for the Company from banks, other lending institutions, Members, or affiliates of the Managers or Members on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the LLCL, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers;

(b) To lease, license or sell any assets of the Company for any Company purpose; provided that the sale of all or substantially all of the assets of the Company, shall require the approval of a majority of the Class A Interests and all of the Class B Interests;

(c) To invest any Company funds;

(d) To purchase liability and other insurance to protect the Company's property and business;

(e) To guaranty the obligations of entities in which the Company is a Member, and other entities which in the opinion of the Managers will be in the interest of the Company or its Members;

(f) To execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, leases, Membership agreements, guarantees, operating agreements of other limited liability companies, and any other instruments or documents necessary in the opinion of the Managers, to the business of the Company;

(g) To employ accountants and legal counsel to perform services for the Company and to compensate them from Company funds;

(h) To enter into any agreement offering a share of Company income;

(i) To make any tax election for the Company under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company;

(j) To make Distributions to the Members of the Company;

(k) To confess a judgment against the Company;

(l) To admit an additional Member or substituted Member to the Company or sell additional Membership Interests to some or all of the existing Members, except that Managers may not sell additional Membership Interests in the Company beyond an amount of $910,000.00 without the written approval of a majority of the Class A Members and a majority of the Class B Members.

(m) To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, and in such forms as the Managers may approve; and

(n) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Managers, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render the Company liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

7.04 <u>Liability for Certain Acts</u>. The Managers shall perform its duties as Managers in good faith, in a manner that the Managers reasonably believe to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. Any member of Managers who so performs the duties as Managers shall not have any liability by reason of being or having been a Managers of the Company. Managers do not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Managers and Members shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Managers or Member.

7.05 <u>Managers' Duty to Company.</u>  The Managers shall not be required to manage the Company as their sole and exclusive function and the Managers may have other business interests and may engage in other activities in addition to those relating to the Company. The Managers shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.   All contracts entered into by the Company with any supplier, contractor, purveyor, manufacturer, or other third party ("Supplier") shall reflect the Managers' best efforts to obtain the best price for the goods or services obtained by the Company.  In the event the Managers or any affiliate of Managers enter into any agreement with any such Supplier with respect to a venture other than the Company, the Managers shall use their efforts to ensure that such other venture does not pay a lower price than the Company or receive a discount with respect to the same goods or services that are or were supplied to the Company.

7.06 <u>Bank Accounts</u>. The Managers may from time to time open bank accounts in the name of the Company, and designate the individuals to be the signatories thereon.

7.07 <u>Resignation and Removal</u>.

(a) In the event that a Manager desires to resign for any reason, the Manager may do so only upon sixty (60) days prior written notice, provided that a successor Manager must first be elected by Members owning a majority of the Class A Interests and Class B Interests, excluding any Membership Interest owned by the resigning Managers.  The resignation of a Manager shall not affect

the Manager's rights as a Member and shall not constitute a withdrawal as a Member.

(b) Any successor Manager may be removed only upon the terms and conditions provided herein.

(d) In the event of withdrawal of Manager, the Manager shall have no further obligations or liabilities to the Company or the Members except such liability with respect to which indemnification is not permitted hereunder and then only with respect to the period prior to the date of its removal or withdrawal.

7.08 <u>Company Books</u>. The Managers shall maintain and preserve, during the term of the Company, all accounts, books, and other relevant Company documents. Upon reasonable request and with reasonable notice , each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's expense.

7.09 <u>Delegation of Duties</u>. The Managers may elect such individual officers of the Company, including a President, one or more Vice Presidents, a Treasurer, a Secretary, and other subordinate or assistant officers, and hire such employees, as the Managers deem necessary or appropriate.

(a) Subject to the control of the Managers, the President shall be responsible for the day to day general supervision, direction and control of the business and affairs of the Company and shall have the general powers and duties of management, and shall have such other powers and duties as may be prescribed by the Managers or this Operating Agreement.

(b) In the absence or upon the disability of the President, the Vice-Presidents, in order of their rank as fixed by the Managers, or if not ranked, the Vice President or Vice Presidents designated by the Managers, shall perform all the duties of the President, and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President. The Vice President shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the President, the Managers or this Operating Agreement.

(c) The Secretary shall keep, or cause to be kept, a book of minutes at the principal office or such other place as the Managers may order, of all meetings of Managers and Members, with the time and place of holding, whether regular or special, and if special, how authorized, the notice thereof given, the names of those present at Managers meetings, the Company Interests present or represented at Members' meetings and the proceedings thereof. The Secretary shall keep, or cause to be kept, at the principal office a transfer record showing the names of the Members and their addresses and the Company Interests held by each. The Secretary shall give, or cause to be given, notice of all the meetings of the Members and of the Managers required by this Agreement or by law to be given,

18

and shall have such other powers and perform such other duties as may be prescribed by the President, the Managers or this Operating Agreement.

(d) The Treasurer shall keep and maintain or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, and capital accounts. The books of account shall at all reasonable times be open to inspection by any Managers or Member. The Treasurer shall deposit all monies and other valuables in the name and to the credit of the Company with such depositories as may be designated by the Managers. The Treasurer also shall disburse the funds of the Company as may be ordered by the President or the Managers, and shall render to the President and the Managers, whenever they may request, an account of all of the transactions as Treasurer and of the financial condition of the Company, and shall have such other powers and perform such other duties as may be prescribed by the President, the Managers, or this Agreement.

(e) The officers of the Company shall be elected annually by the Managers. Each officer shall hold office until a successor shall have been duly elected and qualified or until the officer's death or until the officer shall resign or shall have been removed in the manner hereinafter provided, whichever occurs first. One person may hold more than one office.

(f) Any officer may be removed by a vote of the Managers, either with or without cause, at any regular or special meeting, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Any officer may resign at any time upon written notice to the Company.

(g) A vacancy in the office of any officer, whether as a result of death, resignation, removal, disqualification or any other cause, may be filled by the Managers at any regular or special meeting.

7.10 <u>Compensation of Managers, Officers, Employees, and Affiliates</u>

(a) Employees of the Company shall receive such salaries and/or other compensation as shall be determined by the Managers, adopted in advance or after the rendering of the services, or by employment contracts entered into by the Managers.

(b) The salaries and other compensation of officers of the Company shall be approved by Managers. Election or appointment of any officer or any other employee shall not of itself create contract rights or any rights to compensation hereunder.

(c) The Managers, the Members, and Affiliates shall receive no compensation for their services to the Company except as set forth below:

(i) Andrzej Krakowksi, the President Pine Hill, shall be the writer, director and producer of the Film. He shall receive no fees from the proceeds of the offering. He shall receive an $18,000 deferred fee for his services as writer, and a $54,000 deferred fee for his services as director/producer, which deferred fees shall be treated as Deferments.

(ii) Mahyad Tousi, the President of Tousi shall be line producer and producer of the Film. He shall receive a $16,000.00 fee from the proceeds of the offering, and a $39,000.00 deferred fee, which shall be treated as a Deferment.

The foregoing Deferments and shall be paid *pari passu* with other Deferments out of Gross Receipts after Class A Members have receive a return of 100% of their Contributed Capital.

7.11    Indemnity of the Managers, Officers and Members.    Subject to the limitations of Section 7.04, the Company shall indemnify the Managers, Officers and any Member for judgments, settlements, penalties, fines or expenses incurred in a proceeding to which such person is a party because he, she or it is or was a Member, Officer, or Manager, and shall indemnify such Member, Officer or Manager for advancement of expenses, including costs of defense, prior to final disposition of such proceeding.

## ARTICLE VIII

## RIGHTS AND OBLIGATIONS OF MEMBERS

8.01    Limitation of Liability.    The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debt, obligation and liability of the Company and not of the Member or the Managers. Each Member's liability shall be limited as set forth in this Operating Agreement, the LLCL and other applicable law.

8.02    Liability of a Member or Managers for Improper Distribution.    A Member or Manager who votes for, approves or consents to any distribution that violates any provision of this Operating Agreement or the LLCL shall be liable to the Company jointly, but not severally, with all other Members or Managers so voting, approving or consenting, for the amount of the distribution that exceeds the amount that could have been distributed without violating the LLCL or this Operating Agreement, unless the Member or Managers based their determination that the distribution did not violate such provisions on financial statements prepared on the basis of accounting practices and principals that are reasonable under the circumstances or any other valuation method that is reasonable under the circumstances, and the Member or Managers had no actual knowledge that rendered their reliance on such statements, valuation or method to be unwarranted.

8.03 <u>Members Not Authorized</u>.  Unless designated by Managers no Member is authorized to execute any document to bind the Company or to manage the Company in any respect.

8.04 <u>Class A Members Not Authorized</u>.

(a) Class A Members agree that irreparable damage would occur if a Class A Member should bring an action in court to dissolve the Company. Accordingly, each Member accepts the provisions under this Agreement as the Class A Member's sole entitlement on dissolution and liquidation of the Company. Furthermore, each Class A Member waives and renounces (to the fullest extent permitted by law) the Class A Member's right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company

(b) Each Class A Member waives and renounces any right that the Class A Member may have prior to the dissolution and liquidation of the Company to maintain any action for partition with respect to the Company property.

(c) Each Class A Member waives and renounces any alternative rights that might otherwise be provided by law upon the happening of an Event of Dissociation. Furthermore, each Class A Member accepts the provisions of this Agreement as the Class A Member's sole entitlement upon the happening of an Event of Dissociation.

(d) Each Class A Member waives and renounces any right that the Class A Member may have, in his capacity as an Class A Member, to commence an involuntary bankruptcy proceeding under the Bankruptcy Code or analogous state insolvency laws against the Company.

ARTICLE IX

MEETINGS OF MEMBERS

9.01 <u>Special Meetings.</u> Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Managers or by Members holding at least a majority of the Class A Interests.

9.02 <u>Place of Meetings/Telephonic Meetings</u>.  The place of any meeting may be the principal office of the Company, or any other place designated by the Managers within New York, New York. Meetings may also take place telephonically.

9.03 <u>Notice of Meetings</u>. Except as provided in Section 9.10, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the

meeting is called shall be delivered not less than 10 nor more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or Person calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered three (3) calendar days after being deposited in the United States mail, addressed to the Member at his, her, or its address as it appears on the books of the Company, with postage thereon prepaid.

9.04  Meeting of All Members. If all of the Members shall meet at any time and place, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

9.05  Record Date. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

9.06  Quorum. Members holding at least one-half of all outstanding Class A Interests and a majority of all Class B Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Voting Interests so represented may adjourn the meeting for a period not to exceed 60 days.

9.07  Manner of Acting.   Each Class A Interest and each Class B Interest shall be entitled to one vote on all matters submitted for a vote of the Members.  If a quorum is present, the affirmative vote of Members holding a majority of each of the Class A Interests and Class B Interests shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the LLCL, the Articles of Organization, or by this Operating Agreement.

9.08  Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

9.09  Action by Members Without a Meeting. On any matter that is to be voted on, consented to, or approved by Members, the Members may take such action without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission by a Member or by a person or persons authorized

to act for a Member shall be deemed to be written and signed for purposes of this subsection. For purposes of this subsection, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process, provided that such electronic consents shall then be within 5 business days transmitted by facsimile, or U.S. Mail.

9.10  Waiver of Notice.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

ARTICLE X

TRANSFER

10.01  Transfer.  No Member shall sell, transfer, assign, pledge, hypothecate or otherwise dispose of or encumber any or all of its Membership Interests unless it complies with the provisions of this Paragraph 10.01:

(a)  The Class A Members shall not sell, transfer, assign, pledge, hypothecate or otherwise dispose of or encumber the Class B Interests without the written approval the Managers.

(b)  In the event the a Class A Member (the "Offering Member") desires to sell, transfer, assign, pledge, hypothecate or otherwise dispose of or encumber (hereinafter "Sell") its Membership Interests, it must first obtain the consent of the Managers.  For purposes of this Section 10.01(b) and Section 10.01(c) below, in the event a Member is an entity whose sole business is owning a Membership Interest in the Company, these provisions shall apply to the Membership Interest and the stock or membership interest of the Offering Member which the Offering Member intends to sell.

(c)  In the absence of the consent provided in subparagraph (b) above, an Offering Member shall comply with each of the requirements specified below:

(i)  The Offering Member shall give to the Company and to each remaining Member notice of its bona fide intention to sell his Membership Interests (the "Proposal").  The Proposal shall specifically refer to this Section of the Agreement and shall (A) include a designation of the bona fide person, firm or company, and its address, to whom or to which the Offering Member desires to effect a transfer (the "Prospective Transferee"), (B) specify the total number of Membership Interests which the Prospective Transferee has agreed to purchase (the "Transfer Membership Interests"), the amount of money or other consideration

23

which has been offered to the Offering Member by the Prospective Transferee, and the terms of payment, (C) include a representation by the Prospective Transferee of its intention to acquire the Transfer Membership Interests for the price and upon the terms set forth in such notice and shall be signed by the Offering Member and by the Prospective Transferee.

(ii) For 30 days after receipt of the Proposal, the Company shall have a first option to purchase all but not a portion of the Transfer Membership Interests, at its election, for a price equal to the price set forth in the Proposal.  The election by the Company shall require the vote of a majority of the Class A Members for a Class A Membership Interest and a majority of the members of the Managers for a Class B Interest; provided, however, that the Offering Member shall be required to vote his Membership Interests in favor of the exercise of the Company's option.  If the Company shall not have sufficient surplus or stated capital for such purchase, the Members, including the Offering Member, shall vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be necessary or appropriate to enable the Company lawfully to purchase and pay for the Membership Interests so offered.

(iii) If the Company shall not exercise its option to purchase the Transfer Membership Interests, each of the remaining Members shall, for a further period of 30 days, have an option to purchase all of his proportionate share (determined based on the number of Membership Interests of any class held) of the Membership Interests not elected to be purchased by the Company on the same terms as would have been paid by the Company.   For an additional period of seven days, the Members shall have the further right to purchase any Membership Interests which are not purchased by other Members.

(iv) If after expiration of the applicable time periods referred to in subparagraph (c)(ii) and (iii), the Company and the remaining Members shall not have advised the Offering Member of their intent to participate in any such proposed sale, then the Offering Member shall be free to Sell the Transfer Membership Interests to the Prospective Transferee as described in the Proposal, but only on terms and conditions no more favorable to such transferee or transferees than those specified in the Proposal.

(v) The closing of any such purchase and sale, whether it be with the Company, the remaining Member or the Prospective Transferee, shall take place no later than 90 days from the date of the Proposal.  The purchase shall be made upon the terms specified in the Proposal. The transfer to the Prospective Transferee shall be permitted only if the Prospective Transferee executes this Agreement.

(vi) If a proposed sale by the Offering Member is permitted by the provisions of this paragraph 2 but is not consummated in accordance herewith, other than by reason of default by the Offering Member of any of the terms of this Agreement, within 120 days after the date of the Proposal, the Offering Member shall not thereafter sell any Membership Interests of stock unless he shall again comply with the provisions of this paragraph 2.

10.02 <u>Status of Transferee</u>. Any transferee acquiring a Membership Interest in a transaction pursuant to Article X hereof shall be deemed a Member under this Operating Agreement and shall be bound by the obligations of a Member hereunder, including the terms and conditions hereof relating to the future disposition of his, her or its Membership Interest. The transferee, upon transfer of the Membership Interest to the transferee, shall acknowledge in writing that he, she or it is bound by the terms and provisions of this Operating Agreement. For the purposes of this Operating Agreement the heirs or trustees of Members shall automatically be deemed Members of the Company upon the death of the Member, and such heir or trustee shall have all the rights and obligations of Members of the Company, and shall be required to sign this Operating Agreement.

ARTICLE XI

DISSOLUTION AND TERMINATION

11.01 <u>Dissolution</u>.

(a) The Company shall be dissolved upon the occurrence of any of the following events:

(i) Any event requiring dissolution under Delaware law; or

(ii) By the written agreement of a majority of the issued Class A Interests and unanimous vote of the Managers.

(b) As soon as possible following the occurrence of any of the events specified in this Section affecting the dissolution of the Company, the appropriate representative of the Company shall execute the Certificate of Dissolution in such form as shall be prescribed by the State of Delaware and shall file the same with the Secretary of the State.

(c) If a Member who is an individual dies or a court of competent jurisdiction adjudges him or her to be incompetent to manage his or her person or his or her property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his or her estate or administering his or her property.

11.02  Effect of Filing of Certificate of Dissolution.   Upon the filing of the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business.

11.03  Winding Up, Liquidation and Distribution of Assets.

(a) Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Managers shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Managers shall:

(i) Sell or otherwise liquidate all of the Company's liquid assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(ii) Pay or provide for the payment of all of the Company's liabilities and liquidating expenses and obligations. If liquid assets are to be distributed to the Members in kind, Members shall accept the liquid assets subject to their proportionate Membership Interest share of the Company's losses,

(iii) Pay pro rata any loans or advances that may have been made by any of the Members to the Company,

(iv) Allocate any profit or loss resulting from such sales to the Members' Capital Accounts,

(v) Establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company,

(vi) Distribute the remaining liquid assets in the following order:

(A) If any liquid assets of the Company are to be distributed in kind, the net fair market value of such liquid assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such liquid assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted to reflect such deemed sale.

(B) The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managers, with any liquid assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2)(ii)(b)(2) of the Treasury Regulations.   The remaining liquid assets, proceeds of sale or income of the Membership generated thereafter shall be distributed to the Members in accordance with Article VI.

(C) Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(D) A reasonable time shall be allowed for the orderly liquidation of the liquid assets of the Company and the discharge of the liabilities to creditors so as to enable the Managers to minimize the normal losses attendant upon a liquidation. Upon completion of the winding up, liquidation and distribution of the liquid assets, the Company shall be deemed terminated.

(E) The Managers shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

ARTICLE XII

AMENDMENTS

12.01 Proposal and Adoption of Amendments Generally.

(a) Amendments to this Agreement that are of an inconsequential nature and do not adversely affect the rights of any Member or Managers in any material respect my be made by the Managers without the consent or approval of any

27

Member; provided, that promptly thereafter the Manager provide a description and copy of the amendment to the Members.

(b) Any amendment other than an amendment pursuant to 12.01(a) to this Agreement may be proposed by the Managers or by the Members, upon the written request of the Members of record holding at least 15% of total Membership Interests. In proposing an amendment the Members shall submit (i) the text of such amendment; (ii) a statement of the purpose of such amendment; and (iii) an opinion of counsel obtained by the proposing Members to the effect that such amendment is permitted by the Law and will not impair the limited liability of the Company as a partnership for federal income tax purposes.

With the exception of amendments executed pursuant to 12.01(a), this Operating Agreement may not be amended except by an affirmative vote of the holders of a majority of the Class A Interests and a unanimous vote of the Managers.

## ARTICLE XIII

### MISCELLANEOUS PROVISIONS

13.01 <u>Notices</u>.  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer or manager of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in the United States mail, addressed and sent as aforesaid, or upon delivery if delivered personally.

13.02 <u>Books of Account and Records</u>. Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be at all times maintained at the principal executive office of the Company, and/or at the offices of the Company's accountant, and shall be open to the reasonable inspection and examination of the Members or their duly authorized representatives during reasonable business hours.

13.03 <u>Application of Delaware Law and Arbitration</u>. This Operating Agreement and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Delaware, and specifically the LLCL. Any dispute hereunder shall be resolved solely by arbitration before a single arbitrator in the City and County of New York. The decision of the arbitrator may include a ruling allocating the

expense of attorney's fees and arbitration fees and expenses to any party or parties to the dispute. The decision of the arbitrator shall be final, and may not be appealed, and may be entered as an enforceable judgment in any court of appropriate jurisdiction.

13.04  Waiver of Action for Partition.  Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

13.05  Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interests and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

13.06  Construction.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.07  Headings.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

13.08  Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not constitute a waiver of any such violation or obligation, nor prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.09  Rights and Remedies Cumulative.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

13.10  Severability.  If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.11  Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

13.12 Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

13.13 Entire Agreement. This Operating Agreement sets forth the entire agreement between the parties and supercedes all prior agreements and understandings between the parties.

13.14 Investment Representations. The undersigned Members understand (1) that the Membership Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, as amended, the securities laws of the State of Delaware or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering, (2) that the Company has relied upon the fact that the Membership Interests are to be held by each Member for investment, and (3) that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member with a view to distribution. Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Membership Interests for such own Member's account, for investment and not with a view to the resale or distribution thereof.

13.15 Substitution of Signature Pages: This Agreement has been executed in duplicate by the undersigned Member and one executed copy of the signature page is attached to the undersigned's copy of this Agreement. It is agreed that the other executed copy of such signature page may be attached to an identical copy of this Agreement together with the signature pages from counterpart Agreements which may be executed by other Members.

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement constitutes the Operating Agreement of LOOKING FOR PALLADIN, LLC adopted by the Members of the Company as of June _30_ , 2006.

Pine Hill Productions, Inc.
By: Andrzej Krakowski, President

Tousi Productions, LLC.
By: Mahyad Tousi, Mgr.

SCHEDULE A

**CAPITAL CONTRIBUTIONS**

| Member | Address | Capital Contribution | Class A Interests |
|---|---|---|---|
| Palladin Pictures, LLC. | 4 Pine Hill Drive Katonah, NY 10536 | $100,000.00 | 1.4285 |
| Andrzej Krakowski & Mica Elczewska | 4 Pine Hill Drive Katonah, NY 10536 | $500,000.00 | 7.1428 |
| Aryeh Cohen | 1866 East 13th Street Brooklyn, NY | $70,000.00 | 1 |

SCHEDULE B

**INITIAL BUDGET**

## FORM OF SIGNATURE PAGE

The Undersigned hereby executes this signature page, which is to be attached to Agreement of Company dated as of _____, 2006 (the "Agreement", and agrees to be bound by all the terms and conditions of the Agreement.

Dated: _July 17, 2006_____

Name of Member: _Aryeh Cohen_____

By: _____

Name:
Title: _Aryeh Cohen_