**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
**ARYEH COHEN**                                              :
                                                             :    **07CV6359(HB)**
                          **Plaintiff,**                     :    **OPINION & ORDER**
                                                             :
                        **-against-**                        :
                                                             :
**LOOKING FOR PALLADIN, LLC, MAYHAD**    :
**TOUSI, TOUSI PRODUCTIONS, LLC**        :
**KRAKOWSKI and PINE HILL,**             :
**PRODUCTIONS, INC.,**                   :
                                                             :
                        **Defendants.**   :
-------------------------------------------------------------x

**Hon. HAROLD BAER, JR. District Judge,**

Plaintiff Aryeh Cohen, a former law student and aspiring actor, alleges two claims against Defendants:[1] 1) a securities fraud claim for sale of an unregistered security to an unaccredited investor, himself, and 2) a claim for intentional infliction of emotional distress because of threats to make false accusations allegedly made by the film's producer, Tousi, while on location.  See generally Amended Complaint.  Plaintiff wanted to act in the Defendants' film Looking for Palladin.  See Am. Compl. ¶¶ 9.  The parties negotiated a deal whereby the Plaintiff could act in the film if he bought one share in the Limited Liability Company created to finance the film.  Each share cost the purchaser $70,000.  Am. Compl. ¶¶ 42.  The Plaintiff agreed, but could only afford $65,000 up front and the $5,000 balance a few months thereafter.  Am. Compl. ¶23.  This arrangement was accepted and the Plaintiff executed the Subscription Agreement and Operating Agreement on July 17, 2006.  See Am. Comp. ¶26; see also Def. Not. of Second Mot. to Dismiss, Ex. A, Subscription Agreement; Ex. B, Operating Agreement.

Defendants move to dismiss the two claims.  They argue that the securities claim must fail because the Plaintiff represented to the Defendants that he was an accredited

---

[1] The Defendants are 1) Looking Palladin, LLC, 2) Pine Hill Productions, Inc., 3) Tousi Productions LLC, the Managers of the LLC, 4) Andrez Krakowski, President of Pine Hill, and 5) Mahyad Tousi, Manager of Tousi Productions.

investor by signing the Subscription Agreement and Defendants argue that they had no reason to know that he was not an accredited investor.  See Def. Mem. of Law in Supp. of Second Mot. to Dismiss at 3, 7-8 ("Def. Mem.").  The Defendants state that the offering here is exempt from registration requirements under the Securities Act of 1933 based on two provisions of Section 4—§ 4(2) exempting transactions by an issuer not involving a public offering, 15 U.S.C. § 77d(2), and §4(6) involving offers or sales by an issuer solely to one or more accredited investors if the aggregate offering price does not exceed $5,000,000, 15 U.S.C. §77(d)(6).  See Def. Mem. at 6.

The Subscription Agreement signed by the Purchaser included an Investment Representation provision which described the offering as exempt from registration under §4(2) and the purchaser's acknowledgement that the company's reliance on such exemption is predicated on the purchaser's representation that he was an accredited investor as such term is defined in Rule 501(a) of Regulation D, the regulations implementing the exemptions under Section 4, 17 C.F.R. §230.501-230.508.  Therefore, Defendants argue that under the Securities Act, the sale was not unlawful and the securities did not lose their exempt status.  Def. Mem. at 8-9.

The Defendants also argue that the intentional infliction of emotional distress (IIED) claim must fail because 1) the Plaintiff is really making a contractual claim, not a tort claim, therefore it is not cognizable, and 2) the Plaintiff fails to meet the elements of IIED under New York law, which requires overcoming a high bar.  Def. Mem. at 10-12.  Finally, Defendants argue that the disputes are arbitrable based on the arbitration clause in the Operating Agreement.  Def. Mem. at 12-16.  Since I agree that the dispute is arbitrable, there is no need to reach the other contentions posed by the parties.

The Federal Arbitration Act provides that a

> written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The federal policy strongly favors arbitration and any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration.  Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25 (1983).  Delaware

law, which is the governing law of the Operating Agreement, tracks the Federal Arbitration Act and New York law of arbitration closely and there is a strong presumption of arbitrability. Westendorf v. Gateway 2000, Inc., No. 16913, 2000 WL 307369 at *3 (Del. Ch. Mar. 16, 2000).

I find that the arbitration agreement in the Operating Agreement governs the disputes here because the agreements are "interrelated" and signed at the same time. See Shalom v. Advanced Marketing Technology Corp., 1990 WL 260674 (S.D.N.Y. 1990). In Com-Tech Associates v. Computer Associates Int'l, Inc. the court found that a the Partnership Agreement, which included an arbitration clause, governed the rights and obligations of the parties . . . and constituted an "umbrella" for both the System and Marketing Agreements, which did not include arbitration clauses. 753 F. Supp. 1078, 1084 (E.D.N.Y. 1990). The court found that the relationship among the agreements showed that they were "interrelated and dependent on each other." [2] see Westendorf v. Gateway 2000, 2000 WL 307369 (Del. Ch. 2000).

Here, we have two related agreements necessary to complete the transaction. The Operating Agreement is the governing agreement of the LLC. The Subscription Agreement says that the "Company will be operated in accordance with the Operating Agreement furnished to the undersigned" and that the Operating Agreement signature page along with the consideration for the security will be delivered to the Company. See Def. Not. Mot. to Dismiss, Ex. A. Therefore, the Operating Agreement, which governs the relationship between the parties in this securities transaction is sufficient to extend the reach of the arbitration clause and cover disputes arising out of the Subscription Agreement. While there is there is no merger clause clearly integrating the two contracts as in Shalom or language regarding "related purchases" as in Westendorf, we have two

---

[2] The following factors found by the court led it to determine that the arbitration clause in one agreement governed disputes under the other agreements: 1) all three agreements--the Partnership Agreement, the Marketing Agreement and the System Agreement--were all executed at or about the same time; 2) the System and Marketing Agreements are both physically attached to the Partnership Agreement as Exhibits; 3) the Marketing and System Agreements are repeatedly referenced throughout the Partnership Agreement; and 4) the stated purpose of the COM-TECH limited partnership is to, inter alia, enter into the System and Marketing Agreements in order to market the computer system described in the System Agreement; and, 5) finally the arbitration clause itself contemplates arbitration of disputes "in connection with, or in relation to" the Partnership Agreement. Com-Tech Associates v. Computer Associates Intern., Inc., 753 F. Supp. 1078, 1084 (E.D.N.Y. 1990). The fact that the court found that the dispute was arbitrable, but that the defendants had waived their right to compel arbitration by their involvement in the court proceedings does not affect the holding or its applicability here.

agreements, signed simultaneously: one governing the purchase of a security and the other governing the relationship of the parties that could only have been created by the purchase of the security.

Plaintiff argues that the scope of this arbitration clause is narrow and fails to encompass his two claims since the Operating Agreement governs the operations and management of the LLC, whereas his two claims arise in securities law and tort law, respectively. See Pl. Mem. of Law in Opp. to Mot. to Dismiss at 13. The language in this Operating Agreement—"any disputes hereunder"—is sufficiently broad to embrace this dispute. Sodemo v. Chase Manhattan Bank, 95cv2944, 1995 WL 7466382 (S.D.N.Y. Dec. 15, 1995); see also Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 1987 WL 16508 (Del. Ch. 1987).

## CONCLUSION

Because I find that there is a valid arbitration agreement governing the contractual relationship between the parties and that this arbitration agreement is sufficiently broad to govern the claims made here, the litigation is hereby stayed and the parties are compelled to arbitrate the matter pursuant to the terms of the Operating Agreement. The Clerk of the Court is direct to close any open motions.

**SO ORDERED**
**New York, New York**
**February 29, 2008**

U.S.D.J.

4